Samuel M. **KAYNARD**, Acting Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

**NEW YORK MAILERS' UNION NO. 6, INTERNATIONAL TYPOGRAPHICAL UNION**, Respondent.

United States District Court
S. D. New York.
March 6, 1961.

Stuart Rothman, Gen. Counsel, N. L. R. B., Washington, D. C., Charles B. Slaughter, Atty., N. L. R. B., Washington, D. C., of counsel, for petitioner.

Townley, Updike, Carter & Rodgers, New York City, Andrew L. Hughes, New York City, of counsel, for charging party Publishers' Ass'n.

McCauley, Henry & Brennan, New York City, John B. Siefken, New York City, of counsel, for New York Mirror and New York Journal American.

Sidney Sugerman, New York City, Dickstein & Shapiro, Washington, D. C., by Sidney Dickstein, New York City, of counsel, for respondent labor union.

DAWSON, District Judge.

This proceeding comes before the Court upon a petition filed by the Regional Director of the National Labor Relations Board pursuant to Sec. 10(*l*) of the National Labor Relations Act, as amended (herein called the Act), Sec. 160(*l*) of Title 29 U.S.C.A., for a temporary injunction restraining the respondent, pending final disposition of the matter before the National Labor Relations Board, from engaging in, or inducing or encouraging individuals employed by the New York Herald Tribune, the New York Mirror or the New York Journal Ameri-

can to engage in a strike or refusal in the course of their employment to use, manufacture, process, transport or work on any goods, articles, materials or commodities, or to refuse to perform any services, where the object is to force or require the aforesaid New York Herald Tribune, the New York Mirror and the New York Journal American, or any other person, to cease using, handling, selling, transporting or otherwise dealing in the products of, or to cease doing business with, Neo-Gravure Printing Company.

The charge alleges that the respondent is engaged in an unfair labor practice within the meaning of Sec. 8(b) (4) of the Act, which makes it an unfair labor practice for a labor organization or its agents

> "to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use * * * transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services * * * where in either case an object thereof is:
>
> * * * * * *
>
> "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *"

The petition is predicated upon the conclusion of the Board that it has reasonable cause to believe that the respondent is engaged in an unfair labor practice and that a Board complaint should issue thereon. An order to show cause was issued by the Court, including a temporary restraining order. A hearing has been held and testimony taken.

The Court makes the following findings of fact:

1. The charge filed with the Board in this matter was filed by the Publishers' Association of New York City (herein called the Association). The Association is an organization composed of employers who are engaged in New York City in printing and publishing daily and Sunday newspapers. Among the members of the Association are the New York Herald Tribune, Inc. (herein called "Tribune"), New York Mirror, Division of Hearst Corporation (herein called "Mirror") and New York Journal American, Division of Hearst Consolidated Publications, Inc. (herein called "Journal American").

2. The Tribune is engaged in New York City in printing, publishing and distributing a daily and Sunday newspaper known as the "New York Herald Tribune." The weekly circulation of the Sunday edition, which contains a section known as "Today's Living," is approximately 555,000, including distribution to points and places outside the State of New York.

3. Mirror is engaged in New York City in the printing, publishing and distribution of daily and Sunday newspapers respectively known as the "Daily Mirror" and "Sunday Mirror." The "Sunday Mirror" includes a section entitled "New York Mirror Magazine" and is distributed throughout the United States and certain foreign countries.

4. Journal American is engaged in New York City in the printing, publishing and distribution of daily and Sunday newspapers called "Journal American." The Sunday edition includes a section known as "The American Weekly," which is distributed throughout the United States and Canada.

5. Respondent, the New York Mailers' Union No. 6, is a labor organization engaged within this judicial district in transacting business and promoting its interests. It is the bargaining representative of certain employees employed in the mail rooms of the Tribune, Mirror and Journal American.

6. Among the duties of such mail room employees of the Tribune, Mirror and Journal American is the handling in

preparation for shipment of the aforesaid Sunday supplements "Today's Living," "New York Mirror Magazine" and "The American Weekly," which are distributed as part of the respective Sunday editions of the aforesaid newspapers. It is essential that a large percentage of these sections be shipped well in advance of the issue date in order to accomplish full distribution of the complete paper. The flow of distribution of these papers is a continuing one, scheduled throughout the week.

7. Neo-Gravure Printing Company (herein called Neo-Gravure) is a person engaged in commerce having its principal place of business in Weehawken, New Jersey, where it is engaged in the printing industry. At all times material hereto and since prior to February 20, 1961, Neo-Gravure has engaged in the printing of "Today's Living" for the Tribune, the "New York Mirror Magazine" for the Mirror and "The American Weekly" for the Journal American, and has been printing such Sunday supplements for these newspapers pursuant to contracts with those newspapers and shipping them to the offices of the newspapers in New York City.

8. Sometime prior to February 20, 1961, respondent New York Mailers' Union No. 6 has had a labor dispute with Neo-Gravure and beginning February 20, 1961 called a strike against Neo-Gravure. The strike apparently has not been particularly effective. Neo-Gravure has continued to print the aforesaid Sunday supplements and to have them delivered to the offices of the respective newspapers in New York City. At no material time herein has respondent labor union had any labor dispute with the Tribune, Mirror or Journal American.

9. Nevertheless, in furtherance of the aforesaid dispute with Neo-Gravure, respondent labor union since on or about February 20, 1961, has ordered, requested and appealed to its members employed in the mail rooms of the Tribune, Mirror and Journal American not to perform services for their respective employers in connection with the handling of the aforesaid Sunday supplements as they are delivered to the mail rooms of the respective newspapers by and from Neo-Gravure.

10. As a result of the conduct of respondent since on or about February 20, 1961, individuals who are members of or represented by respondent labor union have refused to handle shipments of "Today's Living," "New York Mirror Magazine" and "The American Weekly" printed by Neo-Gravure after February 20, 1961 and received in the mail rooms of such newspapers respectively. The result has been that certain of the newspapers distributed by these publishers have had to be distributed without the Sunday supplement enclosed and in certain instances the supplements have had to be inserted by dealers and wholesale distributors in places other than New York City. The aforesaid activities continued from February 20, 1961 until a temporary restraining order was issued by this Court, and there is every reason to believe that unless the activities of the respondent are enjoined in this respect the same refusal to handle and work upon these copies of the Sunday supplements of these newspapers will be made by employees who are members of or represented by the respondent union.

11. When this work stoppage occurred at the respective newspapers, the circulation manager of the Mirror got in touch by telephone with the president of the respondent union and asked him if the members of the respondent union would handle the Sunday supplement coming from Neo-Gravure. The president said "no." He was then asked, if the Sunday supplement was printed elsewhere, whether respondent union would handle it and he replied "yes." The president of the respondent union advised the circulation manager of another newspaper that if the Sunday supplement were printed in the plant of Alco, a printing plant whose members are represented by the respondent union, that his men would handle the Sunday supplement when copies arrived at the news-

paper offices, but would not handle the Sunday supplement printed by Neo-Gravure.

## Discussion

There seems to be no dispute as to the essential facts in this matter. There was no dispute that the respondent union had no labor dispute with the Tribune, the Mirror or the Journal American. There was no dispute that the members of the respondent union performed their duties as mailers in connection with the insertion of the Sunday supplements in their respective newspapers and the distribution of the newspapers containing the Sunday supplements up to February 20, 1961. There was no dispute that respondent union is engaged in a labor dispute with Neo-Gravure, which prints the Sunday supplements. When a strike was called at the plant of Neo-Gravure on February 20, 1961, members of the respondent union employed at the respective newspaper offices refused to handle copies of the Sunday supplements thereof until a temporary restraining order was issued by this Court. There is no dispute that the president of the respondent union advised representatives of the publishers that so long as the Sunday supplements are printed by Neo-Gravure, with whom the union had a dispute, the members of the union employed by the respective newspapers would not handle the Sunday supplements but, if the newspapers had the Sunday supplements printed at some other plant with which the union had no dispute, the members of the union would perform their duties with reference to such Sunday supplements when they arrived at the newspaper offices.

The only point of controversy which developed at the hearing was whether the activities of the respondent union and its members had as an object forcing the newspapers to cease doing business with Neo-Gravure. There was no dispute that the respondent union had encouraged its members to engage in a refusal in the course of their employment to handle goods, articles and materials produced by Neo-Gravure. The Act, however, makes it an unfair labor practice only if such refusal has for an object the "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."

The union took the position that their object was not to require the publishers to cease doing business with Neo-Gravure, but rather, that respondent's object was to relieve its members from handling what it called "struck work," that is, products which were made at a plant where certain of its members were on strike.

■ Once a petition has been filed by the Labor Board it is the role of this Court to ascertain whether the Board had reasonable cause to believe that the charge was true. Douds v. Milk Drivers and Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 538. It is not necessary for the Court, in order to grant relief, to find that the charges are true, but only whether the Board had reasonable cause to believe that the charges were true. It has been held that the requirement put upon the Board is met by a showing of sufficient evidence that there was a basis for the Board's findings. Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 242 F.2d 808, 810.

Whether the Court agrees with the provisions of the Labor Management Relations Act, as amended, is not an issue in this case. The Act is specific and represents the view of Congress on this situation and, as such, must be applied by the Court. There would certainly seem to be sufficient evidence in this case to demonstrate that there was a basis for the Board's finding that the object of the activities of the respondent union was to force the publishers to cease doing business with Neo-Gravure, at least until such time as the labor dispute at Neo-Gravure had been brought to a conclusion. This conclusion is supported by the following facts:

(1) Until respondent union was engaged in a strike at Neo-Gravure there was no effort made to induce its membership working for the publishers to refuse to work on or handle the Sunday supplements printed by Neo-Gravure. As soon as the strike started at Neo-Gravure the employees represented by the respondent union, employed by the publishers, refused to handle the product printed by Neo-Gravure.

(2) Representatives of the Publishers were advised that if the Sunday supplements were printed by another printing plant, other than Neo-Gravure, the employees represented by the respondent union would handle work on and process such Sunday supplements.

It would be a naive person indeed who did not recognize that the respondent union was saying in effect to the publishers that if you want our men to work on the Sunday supplements they must be printed by some outfit other than Neo-Gravure, thereby forcing the publishers to cease doing business with Neo-Gravure until respondent union had successfully terminated its dispute with Neo-Gravure. This type of conduct has been known as a secondary boycott. It is the type of conduct which Congress intended to eliminate by the provision of the Act hereinabove referred to. It was described by Judge Learned Hand when he stated, in International Brotherhood of Electrical Workers v. National Labor Relations Board, 2 Cir., 181 F.2d 34, 37, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299:

> "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands."

The Court concludes that the petitioner has reasonable cause to believe that respondent union has been engaged in conduct which is in violation of Sec. 8(b)(4) of the Act. A preliminary injunction will be issued, as sought by the Board, in accordance with the provisions of Sec. 10(l) of the Act. Submit decree in accordance herewith.