Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK CITY AND VICINITY, Respondent.

United States District Court
S. D. New York.
Sept. 28, 1962.

Samuel M. Kaynard, Reg. Atty., New York City, by Allen R. DeLong, Washington, D. C., of counsel, for N. L. R. B.

Lord, Day & Lord, New York City, by Reigh F. Klann, New York City, of counsel, for the New York Times.

Asher W. Schwartz, New York City, for respondent.

EDELSTEIN, District Judge.

This is a petition for a preliminary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, 29 U. S.C. § 160(*l*) as amended, 29 U.S.C.A. § 160(*l*) (Supp.1962). The petitioner, the Regional Director, seeks a preliminary injunction against the respondent, pending a final disposition by the Board, of an unfair labor practice charge filed on September 5, 1962, by the New York Times Company (hereinafter called the Times). The Times filed a charge alleging that the respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (D) of the Act, 29 U.S.C. § 158(b) (4) (i) (ii) (D), as amended, 29 U.S.C.A. § 158(b) (4) (i) (ii) (D) (Supp.1962).[1] An Order to Show Cause why such a preliminary injunction should not be granted was issued on September 21, 1962, and was returnable to this court on September 27, 1962. The Order to Show Cause was placed on the motion calendar for that day and the parties appeared, at which time petitioner requested a hearing. Respondent, by its counsel, did not file an answer to said petition, but raised issues at a preliminary conference which it developed more fully at the hearing. A hearing on the issues raised by the petition and by the respondent's opposing contentions was held that day. All parties were afforded full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issues and to argue on the evidence and the law. The petitioner's case consisted of the testimony of three witnesses: John Murphy, Assistant Manager of Industrial Relations for the Times; John J. Kelly, a supervisory employee in the Times mail room,—the situs of this dispute—; and Raymond Cooper, also a mail room supervisor and a member of the rival union, the New York Mailers Union No. 6, International Typographical Union, AFL-CIO, which will be referred to hereafter as the Mailers. The respondent's only witness was Carl Levy, respondent's business agent. Respondent also introduced a copy of the collective bargaining agreement between it and the Times. Respondent called the court's attention to provisions 2(c), 2

---

[1] "8(b) It shall be an unfair labor practice for a labor organization or its agents—

"(4) (i) to engage in, or induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \*

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work."

(h), and 16. The respondent claims that the jurisdictional dispute that is the subject of the unfair labor practice complaint, and of this petition, should be resolved by arbitration, or by the respondent's own grievance procedures and not by this court.

The court has fully considered the petition, the evidence, and the arguments of counsel. Upon the entire record, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Petitioner is Regional Director of the Second Region of the Board, an agency of the United States, and filed the petition herein for and on behalf of the Board.

2. On or about September 5, 1962, the New York Times, pursuant to the provisions of the Act, filed a charge with the Board alleging that the Newspaper and Mail Deliverers' Union of New York City and Vicinity, a labor organization, has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (D) of the Act.

3. The aforesaid charge was referred to petitioner as Regional Director of the Second Region of the Board.

4. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent, an unincorporated association, is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) Respondent maintains its principal office in New York City, and at all times material herein respondent has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members.

(c) The Times is engaged in the business of printing and publishing a daily newspaper called The New York Times. It holds membership in and subscribes to various interstate news services and advertises nationally sold products. Its gross volume of business exceeds $1,000,000 per annum.

(d) Members of respondent and members of New York Mailers Union No. 6, International Typographical Union, AFL-CIO work in the mail room of the Times where a complex of automatic equipment and conveyor belts are used to stack, wrap and tie bundles of newspapers and deliver them to the trucks. The mail room extends from West 43rd Street to West 44th Street with loading platforms on both streets. Since 1950 the equipment used in connection with the loading operations on the 44th Street side has included a so-called Jampol belt which conveys the bundles of newspapers, after they leave a wire tying machine, onto truck loading conveyor belts which lead to the delivery trucks at the loading platform. The bundles are directed to the proper truck loading conveyors by means of deflectors. The Jampol belt is operated by a set of push-botton controls, attached to the Jampol belt structure, which start, reverse and stop the belt. The deflectors are set manually. Since the Jampol belt was put into operation on the 44th Street sign the work of operating the Jampol buttons and the setting of the deflectors has been performed by members of respondent on papers bound for suburban and nationwide delivery. Such work tasks have been performed by members of Mailers on papers destined for New York City delivery.

(e) On or about August 20, 1962, the Times put a Jampol belt into operation on the 43rd Street side of the mail room to facilitate loading operations on that side of the building. In conformity with the practice in effect on the 44th Street side, the Times assigned respondent's members the work of operating the Jampol belt and setting the deflectors on papers bound for suburban delivery. To members of Mailers it assigned such work on papers bound for city delivery.

(f) Respondent has not been certified by the Board as the bargaining repre-

sentative for employees performing the work of operating the Jampol control buttons or setting the deflectors on the 43rd Street side. Nor has the Board issued an order directing the Times to bargain with respondent as the representative of the employees performing such work.

(g) Since on or about August 29, 1962, respondent, through its business agent, Carl Levy, has demanded that the work of operating the Jampol buttons and setting the deflectors on papers bound for city delivery on the 43rd Street side be assigned to its members rather than to members of Mailers, and respondent has threatened to stop all work by its members unless the Times complied with its demand.

(h) On September 6, 1962, as a member of Mailers took over the operation of the Jampel belt control buttons on the 43rd Street side for a city run, respondent's business agent, Carl Levy, ordered all its members who were at work in the mail room to cease work. This order was obeyed. Respondent stated that under no circumstances would it allow its members to work unless a member of respondent operated the Jampol belt on city deliveries. As a result, since September 6, the Times has been forced to discontinue operating the Jampol belt on the 43rd Street side.

(i) By the acts and conduct set forth in Findings of Fact 4(g) and (h) above, and by other means, respondent has engaged in, and has induced and encouraged individuals employed by the Times to engage in refusals in the course of their employment to use, transport, or otherwise handle or work on goods, articles, materials or commodities or to perform services, and has threatened, coerced and restrained the Times.

(j) An object of the acts and conduct of respondent set forth in Findings of Fact 4(g), (h) and (i) above, was and is to force or require the Times to assign the work of operating the Jampol control buttons and setting the deflectors on papers bound for city delivery to employees who are members of or repre-

sented by respondent, rather than to employees who are members of or represented by Mailers.

(k) The acts and conduct of respondent set forth in Findings of Fact 4(g), (h), (i) and (j) above, occurring in connection with the operations of the Times, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several states and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

5. It may fairly be anticipated that, unless enjoined, respondent will continue and repeat the acts and conduct set forth in Findings of Fact 4(g), (h), (i) and (j) above, or similar or like acts or conduct.

### DISCUSSION

Upon a review of the testimony it becomes apparent that there is no conflict as to the essential facts concerning this jurisdictional dispute between two unions. It is quite clear that the respondent, the so-called Drivers' Union, has not been certified by the Board as the bargaining representative for employees performing the work of operating the Jampol control buttons or setting the deflectors on the 43rd Street side of the Times building. Had the Board certified respondent as bargaining representative for the Jampol belt on the 43rd Street side or had the Board in the alternative issued an order directing the Times to recognize respondent as the bargaining representative for the 43rd Street Jampol belt, then the prohibition of § 8(b) (4) (i) (ii) (D) would not apply. But absent such a certification the proscriptions of § 8(b) (4) (i) (ii) (D) are clearly applicable.

Section 8(b) (4) (i) (ii) (D) prohibits all strike conduct or an inducement for a work stoppage, whether primary or secondary, that has the coercive object of forcing an employer to assign particular work to employees in one labor organization rather than to employees in another labor organization. This section is designed to prevent the disrup-

tion of interstate commerce resulting from jurisdictional claims by a union to a particular job. The gravamen of harm flowing from a jurisdictional dispute is that its sanctions bear heavily not only on the employer but upon the innocent and unknowing public as well. Congress has provided that such internecine conflicts between warring unions should be halted at their inception by the issuance of a preliminary injunction, pursuant to § 10(l) of the Act.

Section 10(l) was enacted not only to protect the public welfare but to preserve the integrity of the procedure before the Board, which is the tribunal designated by Congress to determine precisely such questions as are propounded by this jurisdictional dispute between rival unions. Douds v. International Longshoremen's Ass'n., 242 F.2d 808 (2d Cir.1957).

■ Section 10(l) of the Act provides that whenever it is charged that an 8(b) (4) unfair labor practice is being committed, the Board shall cause an investigation to be made. If, after such investigation, the Regional Officer has "reasonable cause to believe such charge is true" a complaint issues and the Officer may petition any District Court, on behalf of the Board, for appropriate injunctive relief pending the final adjudication of the Board with respect to the complaint. Upon the filing of any such petition for a preliminary injunction the District Court has jurisdiction to grant such injunctive relief "as it deems just and proper." Douds v. International Longshoremen's Ass'n., supra; Douds v. Milk Drivers & Dairy Employees Union, 248 F.2d 534 (2d Cir.1957); Kaynard v. New York Mailers Union No. 6, International Typographers Union, 191 F.Supp. 880 (S.D.N.Y.1961).

■ Thus, in a proceeding for an injunction under § 10(l) the court's function is limited to the narrow question of deciding whether, based on the evidence, the petitioner has "reasonable cause to believe" that the charges are true. This circumscribed function of the court in

a § 10(l) injunction proceeding was aptly described by Judge Medina in Douds v. International Longshoremen's Ass'n, 242 F.2d 808, 810 (2d Cir.1957):

"The District Court, moreover, on the record before us, had no alternative other than to find that there is more than enough evidence to demonstrate that there was basis for the Board's finding that it had 'reasonable cause to believe' that the 'charge' filed by the * * * Union is true. It is settled law that no more is required on this phase of the case."

The court, therefore, is not required to decide whether, in fact, a violation of the Act has been committed. This ultimate determination with respect to unfair labor practices has been placed by Congress with the Board, subject to review by the Courts of Appeals pursuant to § 10(e) and (f) of the Act. Douds v. Milk Drivers and Dairy Employees Union, supra; Madden v. International Organization of Masters, Mates and Pilots, 259 F.2d 312 (7th Cir.1958), cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958).

■ A review of the testimony demonstrates that the petitioner had reasonable cause to believe that a violation of 8(b) (4) (i) (ii) (D) was, and is still being, committed. The petitioner's witness, Kelly, a Times supervisory employee, testified that on August 29, 1962, he had a telephone conversation with Carl Levy, respondent's business agent, in which Levy stated that the deliverers would have to control "all the buttons on the 43rd Street side" or they would stop work. Kelly further testified that on the evening of September 5th, or some time in the early morning hours of September 6th, Levy again called him and repeated his demand for the Jampol work and the threat of a work stoppage if the demand were not acceded to by the Times. The petitioner's witness, Raymond Cooper, testified as follows: that Carl Levy was present in the Times mail room during the early morning hours of September 6th; that when one of the

members of the Mailers Union pushed the buttons to operate the Jampol belt on the 43rd Street side of the building, Levy ordered his floor men to step back and not to handle the bundles. Cooper further testified that respondent's business agent, Levy, directed a delivery truck to pull away from the loading platform thereby causing the bundles of newspapers to fall to the floor of the mail room. This action by the truck caused a pile up of bundled papers on the floor of the mail room. There is no dispute of the fact that the Jampol operation on the 43rd Street side has been shut down since September 5th. Processing and loading of papers on the 43rd Street side since September 5th has been done manually. The respondent's only witness, business agent Levy, admitted that he threatened a work stoppage in his conversation with Kelly unless his union was assigned to operate the Jampol on the 43rd Street side. His version of the Kelly conversation was that he did not intend to effect a total work stoppage. He explained that he merely wanted the men who would not operate the Jampol belt to be "reassigned" by the shop steward or by the Times' supervisory employees. He did admit, however, his presence in the mail room in the early morning hours of September 6th. His answers on cross-examina- tion corroborated the witness Cooper's testimony that on that occasion he ordered members of the Mailers' Union to step back and refuse to handle the bundles of newspapers.

██ It is apparent from the record that the petitioner has reasonable cause to believe that a violation of § 8(b) (4) (i) (ii) (D) was, and is, being committed. The respondent union has offered very little in the way of evidence to controvert the claim by petitioner that it was inducing a work stoppage in order to force the hand of its employer in the assignment of work to it, rather than the Mailers. All that is offered in opposition is an oblique argument that despite what the facts demonstrate, an injunction is inappropriate at this juncture since this dispute should be resolved internally through the union grievance and arbitration procedures rather than by resort to injunctive relief in this court.[2] Respondent draws particular attention to provisions 2(c), 2(h) and Section 16 of its collective bargaining contract between it and the Times. Those provisions dealing with internal grievance and appeal procedures are inapposite. The respondent and the Mailers' Union have not agreed to submit this work assignment issue to arbitration pursuant to the provisions for arbitration contained in their respective

---

2. "2–C. Whenever new mechanical devices are introduced to perform or aid in the performance of any of the operations included in the bargaining unit, such devices shall be operated exclusively by employees in the bargaining unit.
"2–H. Conditions and methods of operation now prevailing in the respective mailrooms of the Publishers shall not be disturbed insofar as they affect the jurisdiction of the several unions operating in the mailrooms. The Union, however, shall try to negotiate agreements with any other union operating in the mailrooms which will result in the elimination of duplication of work and in the setting up of a procedure for the disposition of any jurisdictional conflict which may arise in the future. In the event such negotiations do not result in agreements within thirty (30) days from the effective date hereof, then this Union shall on its part submit the entire matter to arbitration in accordance with the rules of the American Arbitration Association and shall be bound by the results of such arbitration, provided such other union or unions agree to such an arbitration.
"When full operations commence at an annex or a new or additional building owned or operated by a Publisher signatory to this Agreement, within the territory covered by this Agreement, the jurisdiction of the Union in such building shall be as defined herein, and in 2–A and 2–B of this Agreement."
Agreement between Publishers' Association of New York City and Newspaper and Mail Deliverers' Union of New York and Vicinity. December 8, 1960— December 7, 1962.

collective bargaining agreements. These procedures have not been invoked because the Mailers refuse to submit the dispute to arbitration. Absent such a consensual submission of the dispute to a mutually binding arbitration, the processing of the grievance through respondent's own administrative machinery would not settle this dispute. The grievance provisions of its own contract, relied on by respondent are irrelevant, in the factual context of this proceeding. Respondent contends, however, that the Board is precluded by § 10(k) of the Act, 29 U.S.C. § 160(k), 29 U.S.C.A. § 160(k),[3] from hearing and determining the dispute.

█ In the circumstances (the refusal of the Mailers to arbitrate) it cannot be said that the parties, both unions and the Times, have "agreed upon methods for the voluntary adjustment of, the dispute." In any event, assuming *arguendo* that all the parties had agreed to submit the dispute to an arbitrator, it would mean only that the Board would be precluded by Section 10(k) from making a determination as to which union is entitled to the disputed work. It would not preclude the Board from instituting this injunction proceeding. It is well settled that a § 10(k) hearing and determination is not a prerequisite to the institution of § 10(*l*) proceedings. Schauffler v. United Association of Journeymen, etc., 218 F.2d 476 (3rd Cir. 1955); Local 450, Operating Engineers v. Elliot, 256 F.2d 630 (5th Cir.1958); McLeod v. International Longshoremen's Association, Ind., 177 F.Supp. 905 (E.D. N.Y.1959).

The court finds that the petitioner has reasonable cause to believe that respondent union has been engaged in conduct which is in violation of Section 8(b) (4) (i) (ii) (D) of the Act. A preliminary injunction will be issued, as sought by the Board, in accordance with the provisions of Section 10(*l*) of the Act.

---

3. Section 10(k) provides that:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8(b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."