**Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEW YORK PAPER CUTTERS' & BOOKBINDERS' UNION NO. 119, Respondent.**

United States District Court
S. D. New York.
July 22, 1963.

Jacques Schurre, New York City, for petitioner.

Lieberman, Katz & Aronson, New York City, for respondent.

RYAN, Chief Judge.

This petition has been filed by the Regional Director of the Second Region of the National Labor Relations Board pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S. C.A. § 160(*l*), for a temporary injunction pending the final disposition of the charges now before the Board filed by Automatic Sealing Service, Inc. The charges allege that respondent New York Paper Cutters' & Bookbinders' Union No. 119 has engaged in and continues to engage in unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (B) and (D) of the Act, 29 U.S.C.A. § 158(b) 4 (i) (ii) (B) and (D).

The material facts, as adduced at the hearing held by this Court, establish the following:

Automatic Sealing Service, Inc., a New York corporation, is engaged in New York City in the business of sealing so-called self mailings, such as advertising brochures and circulars, by means of machines which automatically seal the self mailings with a wafer or tab. Small jobs are done on the premises of Automatic, but on large jobs, Automatic customarily sends its own operator and sealing machine to the premises of the customer and the work is performed there. Automatic does a gross business of approximately $130,000 annually, of which amount 10% is derived for services supplied to customers outside the State of New York.

Automatic Sealing Service, Inc., is the parent company of Seal-O-Matic, a company funded by Philip Klein, Secretary-Treasurer, of Automatic, and another, for the purpose of manufacturing and selling throughout the country the seal-o-matic machine. The machine is said to be protected by a patent which is owned by Seal-O-Matic. Automatic has reserved for itself the exclusive franchise to use and employ the patented device and to perform sealing service in the New York area. A policy has been followed by the two companies whereby Seal-O-Matic will not sell or service any sealing machine within the 200 mile radius of New York City. Automatic, as a result, enjoys the exclusive right to perform all sealing services in the New York City area, effectively barring any competition. Certain companies such as McKenzie Bindery and Young Bindery have obtained sealing machines by purchasing them outside New York and have had them then shipped to the city. Success of their operations has been limited, however, by the refusal of Automatic to service these machines when the dyes needed sharpening or had to be replaced.

Over 90% of Automatic's customers are in the printing and binding business

and these customers are members of the Printers League Section of the Printing Industries of Metropolitan New York, Inc., an association which bargains and executes labor agreements on a multi-employer basis. The Printers League Section has a collective bargaining contract with respondent.

Among the members of Association who are customers of Automatic are Bindrite Bindery, Inc., F. M. Charlton Co., Inc., Eff & Zee Bookbinding Co., Esquire Bindery Corp., Fisher Bookbinding Co., Inc., Guide Kalkhoff-Burr, Inc., Lindner Bindery, McKenzie Service, Inc., Pyramid Bindery, Inc., Sender Bindery, Inc., Standard Bookbinding Corp. and Trade Bindery, all of whom have their place of business in New York City and annually ship goods outside the State of New York.

Automatic has assigned the work of operating its sealing machines on and off Automatic's premises to its own employees who are not members of or represented by any labor organization. This labor practice has been carried on for many years. Respondent now has asserted that it has exclusive jurisdiction over the work of operating sealing machines of the kind used by Automatic and has demanded that Automatic or its customers assign the work of operating Automatic's sealing machines to members of respondent. In furtherance and support of its claimed jurisdiction and demand, respondent, since on or about March 15, 1963, engaged in the following acts and conduct:

1. Notified all its members, through its bulletin, "THE BULLETIN OF 119", including members employed by the companies named above, that all machine sealing of self mailings come under the jurisdiction of respondent and all such machine work must be covered by a member of respondent.

2. Told members of Printer's League Section that respondent's members would not work if an Automatic sealing machine operating in their shop was not "covered" by a member of respondent.

3. Refused to permit an Automatic sealing machine to be used in the shops of companies named above unless the machine was operated by a member of respondent, and where no member of respondent was qualified to operate the machine, refused to permit employees of Automatic to operate the machine unless a member of respondent stood by.

4. Told Bindrite that its shop would be pulled if it allowed Automatic sealing machines in its shop or continued to do business with Automatic.

As a result of respondent's acts and demands, the Association members have had their sealing work performed on Automatic's premises rather than on their own premises, or have given no further jobs to Automatic.

Respondent has not been certified by the Board as the collective bargaining representative of any of Automatic's employees, nor has the Board issued an order directing Automatic to bargain with respondent as the representative of any of its employees.

■■ The function of the Court on applications for injunctive relief under the Act has been aptly set forth in McLeod v. Newspaper & Mail Deliverers' Union of New York City & Vic., 209 F. Supp. 434 (1962) wherein it was stated:

"Section 10(*l*) of the Act provides that whenever it is charged that an 8(b) (4) unfair labor practice is being committed, the Board shall cause an investigation to be made. If, after such investigation, the Regional Officer has 'a reasonable cause to believe such charge is true' a complaint issues and the Officer may petition any District Court, on behalf of the Board, for appropriate injunctive relief pending the final adjudication of the Board with respect to the complaint. Upon the filing of any such petition for a preliminary injunction the District Court has jurisdiction to grant such injunctive relief 'as it deems just and proper.' Douds v. International Longshoremen's Ass'n, supra [242

F.2d 808 (2 Cir. 1957)]; Douds v. Milk Drivers & Dairy Employees Union, 248 F.2d 534 (2d Cir. 1957); Kaynard v. New York Mailers Union No. 6, International Typographers [Typographical] Union, 191 F. Supp. 880 (S.D.N.Y.1961).

"Thus, in a proceeding for an injunction under § 10(*l*) the Court's function is limited to the narrow question of deciding whether, based on the evidence, the petitioner has 'reasonable cause to believe' that the charges are true. This circumscribed function of the Court in a § 10(*l*) injunction proceeding was aptly described by Judge Medina in Douds v. International Longshoremen's Ass'n, 242 F.2d 808, 810 (2d. Cir. 1957):

" 'The District Court, moreover, on the record before us, had no alternative other than to find that there is more than enough evidence to demonstrate that there was basis for the Board's finding that it had "reasonable cause to believe" that the "charge" filed by the * * * Union is true. It is settled law that no more is required on this phase of the case.'

"The court, therefore, is not required to decide whether, in fact, a violation of the Act has been committed. This ultimate determination with respect to unfair labor practices has been placed by Congress with the Board, subject to review by the Courts of Appeals pursuant to § 10(e) and (f) of the Act. Douds v. Milk Drivers and Dairy Employees Union, supra; Madden v. International Organization of Masters, Mates and Pilots, 259 F.2d 312 (7th Cir. 1958), cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958)."

■ Upon review of the testimony and on the record before us, we conclude that petitioner had reasonable cause to believe respondent Union had engaged in and was continuing to engage in un-fair labor practices in violation of Secs. 8(b) (4) (i) (ii) (B) and (D).

■ Section 8(b) (4) (i) (ii) (B) is one of the provisions of the Act directed against secondary boycotts. It was the intent of Congress to prevent the enlargement of labor disputes which occur when a neutral bystander is enmeshed in a controversy not his own. See Carrier Corporation v. N. L. R. B., 311 F.2d 135 (2 Cir. 1962); N. L. R. B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

■ Section 8(b) (4) (i) (ii) (D) forbids a union from engaging in or inducing strike action or threatening or coercing any employer whether primary or secondary for the prohibitive objective. This section was designed to protect interstate commerce from disputes arising over jurisdictional claims asserted by one union as against another concerning the assignment of work and the respective rights of each union to such assignment. Although such disputes usually occur between unions the protection afforded by this section has not been limited solely to inter-union disputes. In Vincent for and on Behalf of N. L. R. B. v. Steamfitters Local Union, No. 395, etc., 288 F.2d 276 (1961), the Second Circuit stated:

"Economic coercive activity directed at an employer by a union that seeks work assignments for its members to the exclusion of other workers is the same coercive activity irrespective of whether the employees it seeks to replace are union members or are not union members."

Since 1931 the practice in the industry had been to send small orders of work requiring sealing to the shop of Automatic. When a larger order of 50,000 or more was on hand, Automatic would send a machine and a non-union man to the respective plant. It seems desirable to maintain this status-quo until the pending charges have been determined.

Recently, due to the shortage of work, the Union has taken the position that

sealing work comes within their jurisdiction and, accordingly, constitutes work collectively bargained and contractually protected for members of the union. In order to effectuate its purpose, the Union initiated a program of informing its members and their employers of its intention to preserve such work for its members.

Through Bulletin 119, employees were informed that sealing work was within the jurisdiction of the union. Employers were told that all sealing machines brought into their shops were to be operated by union personnel, or at least union personnel were to be stationed at such machines when in operation. Furthermore, the Bindrite Bindery was informed that the shop would be pulled if the above instructions were ignored.

This concerted activity presents sufficient basis and justification for granting injunctive relief. It is apparent that the normal business between the various binderies and Automatic was and is being curtailed.

The threats of a shop being pulled and the enforced demands of worker coverage on the sealing machines presented the petitioner with reasonable cause to believe a violation of Section 8(b) (4) was present.

It is no defense to the Union that it was endeavoring to preserve the integrity of its jurisdictional control over the sealing machines if the method it chose to enforce such jurisdiction amounts to an unfair practice. In Local 74, United Brotherhood of Carpenters & Joiners of America, A. F. of L., et al. v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 970, 95 L.Ed. 1309, the Court said:

"As determined in the Denver case [N. L. R. B. v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S. Ct. 943, 95 L.Ed. 1284], it is enough that one of the objects of the action complained of was to force Stanley to cancel Watson's contract. It does not immunize such action from § 8(b) 4(A) to show that it also has

as an object the enforcement of a rule of the union that its members should not work on a project on which nonunion men were employed."

Our concern here is to promote the continued and free flow of interstate commerce; the fact that Automatic is charged with some violation of the anti-trust laws or of misuse of its patent monopoly, may not operate to prevent appropriate relief.

The preliminary injunction prayed for by the Board should issue; an order so providing may be submitted.