Max **ROTENBERG**, Acting Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

**PLUMBERS UNION LOCAL 15, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO**, Respondent.

No. 4–69 Civ. 327.

United States District Court
D. Minnesota,
Fourth Division.

Oct. 2, 1969.

Donald A. Romano, Attorney, N. L. R. B., for petitioner.

Donald C. Savelkoul, Minneapolis, Minn., for respondent.

NEVILLE, District Judge.

Before the court, in the form of a petition for temporary injunction brought under Section 10(*l*) of the National Labor Relations Act (29 U.S.C. § 160(*l*)) is the question of whether the Acting Regional Director of the National Labor Relations Board has "reasonable cause to believe" that the respondent, Plumbers Union Local 15, an unincorporated association, is and has been guilty of an unfair labor practice by causing a work stoppage on a construction project, or threatening to do so, where the dispute is a jurisdictional one. At a two-day hearing before this court the following facts appeared:

American Linen Supply Company (American Linen) contracted for, and more than a year ago commenced the construction of, a commercial building in Minneapolis, Minnesota to have a value when completed of three and a half mil-

lion dollars. The general contractor subcontracted certain of the plumbing work to H. S. Horwitz, Inc. (Horwitz), a mechanical contractor and at a later date American Linen contracted directly with Horwitz for some additional plumbing work apparently not included in the general contract. Horwitz' employees are members of respondent Plumbers Union Local 15 (Union). The collective bargaining agreement between them contains the following provision:

"Section 2. As a primary working condition the Local Union shall have the jurisdiction of all handling of equipment and component parts thereof after the unloading by the delivery vehicle to the job site as stated in the preceding or following sections of this agreement."

This agreement apparently is a general one in use between the Union and all, or at least many, plumbing employers who are members of an employers association and it appears to have been in use in substantially the same form for a number of years. At least there has been no showing that the above-quoted clause is something new or that it does not describe work traditionally done by plumbers.

The construction project has now progressed to the point where over 100 pieces of heavy machinery known as washers, extractors, dryers, flat work ironers, presses, etc., are to be moved into the building and set in permanent place. The machines are ponderous in size and weigh from 3,500 lbs. to 24,000 lbs. each. When installed most if not all of them will be connected with plumbing facilities or will have pipe fittings attached.

American Linen, on the basis of an oral arrangement and having faith founded on many years of successful business relationships, hired Pratt's Express Company (Pratt's) to transport and deliver to the new plant site these machines, some new but others to be removed from American Linen's present plant. Pratt's employees are members of the Teamsters Union Local 544. Pratt's contract is said to include also moving the machines from the landing dock at the plant, that is "in-plant" moving, and setting them in final position in the new building. The Union claims that this latter is in derogation of its jurisdiction and that under its contract with Horwitz, quoted above, the work of moving the machinery from the loading dock to its ultimate location in the plant belongs to it and should be performed by its members. Pursuant to this belief and after consultation with the Union officers and after the officers had had one or more conferences with Horwitz, employees who were members of Plumbers Union Local 15 refused to work and left the job on August 28, 1969. Simultaneously, many if not all of the members of the other building trades crafts then on the site, i. e., electricians, sheet metal workers, carpenters and others, for the most part employees of various sub-contractors, left the plant together with some, but apparently not all, of the carpenters and persons employed by the general contractor.

It is clear to the court from the testimony of two officers of the Plumbers Union that its members ceased their work on or about August 28, 1969 because of the above-quoted provision of the collective bargaining agreement. There was much testimony concerning the failure of Pratt's employees to be able to produce Minneapolis Building Trades Cards, which, according to two witnesses easily could be obtained since one or some of Pratt's employees now hold St. Paul Building Trades Cards. While failure of these employees to have such cards may well have had an effect on other members of the Building Trades, it seems quite obvious to the court that even had the Teamsters in Pratt's employ been so equipped, the officers of the Plumbers Union still would contend and would claim a violation of the collective bargaining agreement with Horwitz and would not agree that any one but members of Plumbers Union Local 15 should make in-plant movement of the heavy machinery.

There was testimony that no objection is or was made to in-plant movement of heavy machinery not within the ambit of the Horwitz subcontract which went into the "energy" room of the new building, i. e., two large boilers, three six-ton generators, etc. Also it appears that as to some other crafts, i. e., the electricians and the air conditioning employees, their members assumed jurisdiction over large machinery involving their craft as soon as the same was unloaded at the site and they then accomplish the in-plant moving.

On September 3, 1969 Pratt's filed a charge with the N.L.R.B. alleging an unfair labor practice on the part of the Plumbers Union Local 15 under Section 8(b) (4) (D) of the National Labor Relations Act (29 U.S.C. § 158(b) (4) (D)). A so-called Section 10(k) hearing thereon is scheduled for sometime in mid-October. Since August 28, 1969 there has been an uneasy truce at the job site but in general work apparently has progressed inasmuch as none of the claimed offending machinery has been moved in-plant. Pratt's witnesses estimated their contract was approximately 10% to 15% performed to date. There is no question but that both Pratt's and American Linen are employers engaged in commerce and in industries affecting commerce and that during the past year, Pratt's derived income in excess of $50,000 for services which required transportation of goods and materials across state lines. There is no claim asserted that Plumbers Union Local 15 has been certified by the N.L.R.B. as the collective bargaining representative for Pratt's employees.

The Union points with a good deal of force to the fact that its employer Horwitz is in violation of its collective bargaining agreement with the Union in that as the employer it in effect bound itself by the said agreement that when bidding on a mechanical contract it would include in its bid all of the work falling under the jurisdiction of the plumbers craft as defined in the collective bargaining agreement, or in the alternative if it did not do so, that it would notify the Union. It is quite clear that Horwitz did not bid, and perhaps had no opportunity so to do, on all of the work which the collective bargaining agreement states to be within the jurisdiction of the plumbers and it appears undisputed that it gave the Union no notice thereof at the time as required by Article XVII, Sec. 6 of the Collective Bargaining Agreement. The dispute obviously is not one that is capable of being handled under the arbitration provisions of the collective bargaining agreement.

The petitioner attempts to read into the actions of the Union and to glean from the evidence of the various witnesses adduced at the hearing that the Union and its membership is and was motivated by, and that the purpose of its walk out was with the object of "forcing or requiring any employer to assign particular work to employees in a particular labor organization * * *" within the meaning of Section 8(b) (4) (D) of the National Labor Relations Act (29 U.S.C. § 158(b) (4) (D)).

There is no evidence of any concerted attempt by the Union or the Union employees to force, coerce or even to persuade others to join its walk out, although there is evidence from at least one witness, Shelley, a Pratt's employee that the plumbers' steward on the job at the plant stated to him that absent production of building trades cards by the Teamsters employees of Pratt's, a general walk out might or would occur. This statement is at best equivocal and to the court could well be a mere narrative of expectations or an expression of opinion rather than a threat.

The court is aware that under Section 10(l) of the National Labor Relations Act (29 U.S.C. § 160(l)) its responsibility is to determine whether:

" * * * the officer or regional attorney [of the National Labor Relations Board] to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue * * *."

Though the Section 10(k) hearing has been set before the Board, neither counsel could assure the court as to the length

of such hearing nor the time of ultimate decision and resolution of the matter. At least one somewhat similar matter with which this court is familiar pended approximately two years before a final decision by the Court of Appeals was rendered. Since the present building is nearing completion and occupancy is to be expected within the next few weeks or months, it seems obvious to the court that whatever decision now is made will in effect be a decision on the merits for all practical purposes so far as the present building project is concerned. While it is true that the court is to test only the question of reasonable cause, it cannot avoid the abiding thought that pragmatically its action is final. By the very nature of the hearing process in our system of jurisprudence, and the volume of business pending before the National Labor Relations Board, delays for substantial periods are inevitable. Realistically, the petitioner is asking for a judicial rather than an administrative settlement of the present dispute, perhaps contrary to congressional intent requiring that such matters first should be determined by the Board.

There are in reality three questions posed:

1. To whose jurisdiction ultimately on the merits should the in-plant moving work be assigned. Counsel for the petitioner argues that this is not a question before this court at this time. Nonetheless it would seem that in determining whether petitioner has reasonable cause to believe that a charge is true, an assessment has to be made as to the possibility of ultimate success. Reasonable cause in a very real sense equates with chance of ultimate success. One cannot claim reasonable cause to believe an offense has been committed if in the final analysis and at the last step it will in all likelihood be determined that no violation of law exists. To this court, the question of ultimate success seems foreclosed to the petitioner by two very recent Eighth Circuit decisions. See American Boiler Mfrs. Ass'n v. N. L. R. B., 404 F.2d 547 (8th Cir. 1968) and Ameri-

can Boiler Mfrs. Ass'n v. N. L. R. B., 404 F.2d 556 (8th Cir. 1968). Though these cases did not arise on a request for a temporary injunction, they involved a claimed violation of Section 8(b) (4) of the National Labor Relations Act, particularly sub-section (B). The case at bar is to Section 8(b) (4) (D) what these two cases are to Section 8(b) (4) (B). In both sections (B) and (D) secondary persons are involved although under slightly different circumstances. The above cases enunciate clearly that pursuit of a collective action against a primary employer is not proscribed by (B) which section contains such language; nor does it seem to the court that in this case such "primary" conduct should be proscribed under (D). The two sections are sufficiently analogous in purpose and intent to warrant such conclusion.

Both *American Boiler* cases mention, analyze and rely on National Woodwork Mfrs. Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). In that case the United States Supreme Court stated:

"Strongly held opposing views have invariably marked controversy over labor's use of the boycott to further its aims by involving an employer in disputes not his own. But congressional action to deal with such conduct has stopped short of proscribing identical activity having the object of pressuring the employer for agreements regulating relations between him and his own employees. That Congress meant §§ 8(e) and 8(b) (4) (B) to prohibit only 'secondary' objectives clearly appears from an examination of the history of congressional action on the subject; * * *." 386 U.S. at 620, 87 S.Ct. at 1255.

" * * * This Court accordingly refused to read § 8(b) (4) (A) to ban traditional primary strikes and picketing having an impact on neutral employers even though the activity fell within its sweeping terms. National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284; see Local 761, In-

tern. Union of Electrical etc., Workers, AFL–CIO v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592. Thus, however severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective." 386 U.S. at 627, 87 S.Ct. at 1259.

■ The second *American Boiler* case concludes that the "right of control" in and of itself is of indecisive significance. Under the Section (D) case at bar there can be no doubt that there are some secondary effects to the Union's attempt to enforce its primary contract right with Horwitz, and it can truthfully be said that because of the plumbing subcontract Horwitz entered into it could not control the in-plant movement because it did not bid thereon and for all that appears had no opportunity so to do. This fact however is not decisive. Accordingly this court is of the view that on the merits and after the Board has had its Section 10(k) hearing and appeals if any to the Court of Appeals have been heard and determined, the respondent Union in all likelihood will be awarded or assigned the in-plant moving as traditional plumbers work.

(2) Relying on the correctness of the above conclusion, the second question presented is whether the court should act under Section 10(*l*) and grant a temporary injunction even though convinced that ultimately the petitioner's position in all likelihood may not be sound, on the theory that whether right or wrong in the final analysis Congress intended by enacting Section 8(b) (4) (D) that rights should be foregone by a Union if at the time of their assertion and considering the posture in which the parties then find themselves, some harm will flow to third parties. The court cannot believe that Congress intended that no matter how clear the Union's rights to protect its traditional work, that no matter how the ultimate outcome of the charge before the Board might be, still an injunction must issue in a situation where its issuance for all practical pur-

poses results in a determination on the merits. Only if such can be said to be the intent of Congress, can the Board's petition be granted. This court, attempting to follow the teachings of the two *American Boiler* cases does not believe such an hypothesis is sound.

(3) The third question presented is whether the court can find that the petitioner has "reasonable cause to believe". If the Union by asserting at this time and in this manner its rights against its employer even though it is correct in its assertions is thereby committing an unfair labor practice, then the petitioner is correct. This court cannot subscribe to such doctrine and deny the Union its traditional right of self help. There is no persuasive evidence that the respondent or its members are "forcing or requiring" anything within the meaning of Section (D) except their contract rights nor attempting to coerce members of any other Union despite the petitioner's reliance on the statement of witness Shelley mentioned hereinbefore.

The court has read and is cognizant of cases cited by the petitioner, particularly McLeod v. New York Paper Cutters' & Bookbinders' Union No. 119, 220 F. Supp. 133 (S.D.N.Y.1963); Cuneo v. Local No. 825, Int'l Union of Operating Eng'rs, 306 F.2d 394 (3rd Cir. 1962) and Local Union 825, Int'l Union of Operating Eng'rs (Nichols Electric Co.), 52 LRRM 1043, 140 NLRB 458. *McLeod* involved a going business, i. e., an automatic mail sealing service, and the court granting the injunction there was not determining the final merits as for practical purposes is true in the case at bar. Perhaps the same comment could not be made concerning *Cuneo*, which involved road construction. In any event these cases, though involving jurisdictional disputes, were decided without the benefit of the teachings and the rationale of the two *American Boiler* cases which control in this Eighth Circuit and without the United States Supreme Court's language in *National Woodwork* etc.

This opinion shall constitute findings of fact as contemplated by Rule 52 of the

Federal Rules of Civil Procedure. A separate order denying petitioner's request for a temporary injunction has been entered.