242 F.2d 808
 Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellant,
v.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Ind., Marine Terminal & Warehouse Local 976-4, International Longshoremen's Association, Ind., Local 1277, International Longshoremen's Association, Ind., and Local 1804, International Longshoremen's Association, Ind., Respondents-Appellees.
 No. 154.
 Docket 24277.
 United States Court of Appeals Second Circuit.
 Argued January 16, 1957.
 Decided March 15, 1957.
 
 Jerome D. Fenton, General Counsel Theophil C. Kammholz, General Counsel, Stephen Leonard, Associate General Counsel, Washington, D. C. (Winthrop A. Johns, Asst. General Counsel, of counsel), William W. Kapell, Philadelphia, Pa., and Walter N. Moldawer, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner-appellant.
 John T. Sullivan, New York City, for respondents-appellees.
 Before MEDINA and HINCKS, Circuit Judges, and LEIBELL, District Judge.
 MEDINA, Circuit Judge.
 
 
 1
 An amended charge having been filed with the National Labor Relations Board against appellees charging the unions with unfair labor practices proscribed by Section 8(b) (4) (D) and affecting commerce within the meaning of Sections 2 (6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 152(6), 157, 158 (b) (4) (D), the Board, after investigation, concluded that there was reasonable cause to believe that the unions had engaged in the unfair labor practices charged. Accordingly, the Board applied to the United States District Court for the Eastern District of New York, where the alleged unfair labor practices were committed, for an injunction, as provided in Section 10(l) of the Act, 29 U.S.C.A. § 160(l). The injunction was denied and the Board appeals. We think it clear that the application for the injunction should have been granted and we reverse the order with a direction that the injunction be issued forthwith.
 
 
 2
 Bush Terminal Company owns eight piers and related terminal facilities on the waterfront in Brooklyn, New York, which it leases to steamship and stevedoring companies. The cargo moved annually through these facilities into the stream of interstate and foreign commerce has a value of many millions of dollars.
 
 
 3
 In April, 1956, Bush Terminal entered into an agreement with Abraham Kaplan, a painting contractor and a member of Associated Painting Employers of Brooklyn, Inc., and Local Union No. 645, Brotherhood of Painters, Decorators and Paperhangers of America, AFL-CIO; and thereafter the painters proceeded to do the work thus contracted for.
 
 
 4
 On June 6, 1956, the ILA and its Local unions, appellees herein, demanded that the work be turned over to its members. When Kaplan refused, about 14 to 16 of the ILA men, led by Tony Anastasia, vice-president of the Longshoremen's Union, and Henry Wallace, business agent of appellee Local 976-4, went on Pier # 7, where two of Kaplan's men were on their scaffold painting, and in no uncertain terms Kaplan's men were ordered to "get off the pier." The expulsion of these men was accompanied by the threat that if Kaplan's men resumed work the pier would be picketed. Having little alternative under these circumstances, Kaplan suspended painting at the pier and a charge of unfair labor practices, as above noted, was filed with the Board. When the Board conducted its investigation there was little or no dispute over the fact that Kaplan's men were ordered off the pier and prosecution of the work under his contract by Kaplan made impossible by the threat to picket the pier. Indeed, there was reason to suppose that all work at Bush Terminal might be held up by a strike.
 
 
 5
 It was the contention of the ILA that it had a collective bargaining agreement with Bush Terminal which provided:
 
 
 6
 "It is the intent and purpose of the Company and the Union that this agreement should promote a mutually beneficial and harmonious relationship, establish orderly procedures for the adjustment and settlement of disputes, and provide for uninterrupted conduct of the Company's operations in accordance with the customs and practices heretofore established and now in effect, not inconsistent with this agreement."
 
 
 7
 And the ILA asserted that, according to the "customs and practices" of the past, its men had, over the years, done all the maintenance work at the piers, including the painting. But this is the very matter which it is the function of the Board ultimately to determine and the Board in this proceeding has taken the position that the claims of ILA are unfounded in fact. The District Court, moreover, on the record before us had no alternative other than to find that there is more than enough evidence to demonstrate that there was basis for the Board's finding that it had "reasonable cause to believe" that the "charge" filed by the Painters' Union is true. It is settled law that no more is required on this phase of the case. Douds v. International Longshoremen's Ass'n, Independent, 2 Cir., 241 F. 2d 278; Douds v. Local 50, etc., 2 Cir., 224 F.2d 49; United Brotherhood of Carpenters, etc. v. Sperry, 10 Cir., 170 F. 2d 863. Nor can it be denied that if the facts alleged by the Board are true the ILA is guilty of an unfair labor practice in violation of Section 8(b) (4) (D). International Longshoremen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275.
 
 
 8
 Jurisdictional disputes have been so detrimental to the public interest, as well as violative of private rights, that the injunctive procedure which the Board seeks to invoke here was provided in order "adequately to protect the public welfare"[1] and to preserve the integrity of the procedure before the Board, which is the tribunal designated by the Congress to determine precisely such questions as are propounded by the assertion by the ILA that its members did the painting work on the piers, by the "customs and practices" of the past, and the denial of this assertion made by the Painters' Union. It was not for the District Court to resolve this issue nor did the District Court undertake to do so.
 
 
 9
 The remaining requirement of Section 10(l) is that the issuance of the injunction under the circumstances be "appropriate" and "just and proper."
 
 
 10
 On the very face of the matter there can be no reasonable dispute about the fact that an injunction would be "appropriate." In our opinion it is equally clear that it would be "just and proper." Indeed, a refusal to grant injunctive relief against such strong arm methods as were resorted to here might well be construed as an invitation to others to flout the procedures adopted by the Board to give effect to the mandates of the statute.
 
 
 11
 Although the court below seems to have recognized that what appellees had done, according to the allegations of the Board, was clearly an unfair labor practice by the unions, and that "Bush undoubtedly was faced with a possible strike," it evidently thought the dispute too trivial to warrant interference by injunction. It held that there was no sufficient showing that commerce would be affected "or that the public interest at the moment is vitally at stake." Curiously enough the court also refers to the fact that a decision by the Board might be made promptly, although one of the purposes of the injunctive procedure provided by Section 10(l) is the preservation of the rights of injured parties during the inevitable and ofttimes prolonged delay incident to the final adjudication of the issues by the Board, and the enforcement by this court of final orders of the Board, should such enforcement become necessary. Garner v. Teamsters, Chauffeurs and Helpers, etc., 346 U.S. 485, 489, 74 S.Ct. 161, 98 L.Ed. 228. The injunction is an integral part of the procedure established by the Congress to prevent the continuance of an unfair labor practice.
 
 
 12
 There is a further reference by the court to the desirability of arbitration but the parties did not resort to arbitration and this seems to us to be a mere diversion having no relevancy to the Board's application for an injunction.
 
 
 13
 It is abundantly clear that the alleged unfair labor practice affects commerce, as the ILA is a powerful union and the threat of a strike was no mere idle gesture. Moreover, this question was primarily within the competence of the Board to determine and the findings relative to the "charge" include, at least by implication, the Board's decision that commerce was sufficiently affected. In any event, on this record, a finding that the alleged unfair labor practice did not sufficiently affect commerce would be clearly erroneous. See International Brotherhood of Electrical Workers v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, affirming, 2 Cir., 181 F.2d 34; N. L. R. B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 71 S. Ct. 943, 95 L.Ed. 1284; N. L. R. B. v. Daboll, 9 Cir., 216 F.2d 143.
 
 
 14
 It was not for the District Court to pass upon the "public interest or necessity." These matters had already been decided by the Congress when it passed the Act.
 
 
 15
 We hold that the injunction prayed for should have been granted.
 
 
 16
 Since the oral argument we have received various communications from the parties, and appellees now contend the case is moot. But we disagree.
 
 
 17
 We are informed that the Board has issued its decision in the proceeding under Section 10(k) (116 N. L. R. B. No. 219, 39 LRRM 1036), that appellees have refused to comply and that an unfair labor practice complaint is to be or has been issued. This further emphasizes the need for injunctive relief, as Section 10(l) authorizes the Board, after investigation of the "charge," to apply to the District Court for "appropriate injunctive relief pending the final adjudication of the Board with respect to such matter;" and it is doubtless intended that the injunction shall continue in force until this court has passed upon a petition by the Board for enforcement, in the event the filing of such a petition becomes necessary. Issuance of a complaint and giving notice of hearing is not a final order reviewable by a Court of Appeals. Thompson Products v. N. L. R. B., 6 Cir., 133 F.2d 637.
 
 
 18
 We are further informed that about three weeks after oral argument of this case before us the ILA and Bush Terminal negotiated a new collective bargaining agreement which was signed on February 8, 1957, containing the following clause:
 
 
 19
 "The Employer agrees to employ the members of the Union to perform all the work of repairs, painting, renovations, and alterations in and about the premises of the employer, and the Union shall have the exclusive right to perform any and all such work, except for new construction * * * which work the employer may have performed by outside contractors. * * *"
 
 
 20
 But neither Kaplan nor the Painters' Union has withdrawn the "charge" filed with the Board.
 
 
 21
 If we were to hold that this concession by Bush Terminal made the case moot and deprived the Board of all power to vindicate the rights of Kaplan and the Painters' Union, we would indeed be drawing the teeth of the statute. If the conduct of the ILA was an unfair labor practice at the time of the offense, it became none the less so because of the concession made by Bush Terminal in its February 8, 1957 contract with the union. Viewed from another angle, if fear of violence and the threat of a strike, which might or might not extend to the entire waterfront of the Port of New York, furnished sufficient pressure to keep Kaplan's men off the pier, it is far from clear that similar considerations might not have had something to do with the concession made by Bush Terminal. Accordingly, we cannot ignore the "charge" made by the Board, and the proofs submitted to the court below, because of the new agreement, for this would compound the error already made herein by the denial of the injunction. See Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 134-135, 57 S.Ct. 382, 81 L.Ed. 557.
 
 
 22
 Indeed, the contract of February 8, 1957, may be only another phase of the prolonged and unlawful efforts of the ILA to obtain for their members a monopoly of all maintenance work on the Brooklyn waterfront. See United Association of Journeymen, 108 NLRB 186, 199-200.
 
 
 23
 In any event, the new contract would seem to have no relevancy whatever to the rights of Kaplan and the Painters' Union which cannot be superseded thereby; and the unfair labor practice involved in the "charge", and now alleged in the complaint issued by the Board, remains. Wendnagel & Co., 116 NLRB No. 132, 38 LRRM 1399; Carrier Corporation, 111 NLRB 940, 944-5; Cliff Schiel Plumbing Co., 109 NLRB 783, 787-8; United Association of Journeymen, supra, at 196; Ora Collard, 98 NLRB 346, 348. See also N. L. R. B. v. American Nat. Ins. Co., 343 U.S. 395, 399, 72 S.Ct. 824, 96 L.Ed. 1027; N. L. R. B. v. Spitzer Motor Sales, 2 Cir., 211 F.2d 235.
 
 
 24
 We hold the case has not become moot, we reverse the order appealed from and remand the case to the District Court with directions to issue the injunction forthwith.
 
 
 
 Notes:
 
 
 [1]
 See S.Report No. 105, 80th Congress, 1st Sess., p. 8