**RAILWAY EXPRESS AGENCY, IN-CORPORATED, Plaintiff,**

v.

**EMPIRE CITY LODGE 2035 OF the BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STA-TION EMPLOYES,** an unincorporated association, Leo Mintz, individually and as President of said association, John Mullins, individually and as Vice President of said association, George Leonidas, individually and as Recording Financial Secretary and Treasurer of said association, John Carlo, individually and as Chairman of the Board of Trustees of said association, Stephen E. Milone, individually and as Chairman of the Protective Committee of said association, and as representatives of the members of said association, **Defendants.**

No. 67 Civ. 88.

United States District Court
S. D. New York.

Feb. 16, 1967.

Robert E. Johnson, New York City, Marcus M. Curry and Joel H. Gross, New York City, of counsel, for plaintiff.

Robert Silagi, New York City, Mitchel B. Craner, New York City, of counsel, for defendants.

MANSFIELD, District Judge.

In this suit, commenced on January 9, 1967, the Railway Express Agency, Incorporated ("REA" herein) seeks to enjoin the Empire City Lodge 2035 ("the Lodge" herein) of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes ("BRC" herein) and certain of its officials from authorizing or carrying out a strike or work stoppage by plaintiff's employees in the area of New York City who are members of the Lodge, and $325,800 damages for each day after January 8,

1967 during which such strike may be conducted. Plaintiff, a Delaware corporation, is a common carrier engaged in interstate commerce, which has its principal office in New York City and is subject to the provisions of the Railway Labor Act. Jurisdiction is invoked pursuant to Title 28 U.S.C. §§ 1331 and 1337, and Title 45 U.S.C. § 151 et seq. (the Railway Labor Act). The amount in controversy exceeds $10,000, exclusive of interest and costs.

The Lodge is an unincorporated association and voluntary labor organization subject to the provisions of the Railway Labor Act. It is one of many similar lodges located throughout the United States, the members of which are employees of the plaintiff. The Lodge's membership consists of the vehicle employees of the plaintiff located in the New York metropolitan area.

Prior to December 10, 1965, REA's vehicle employees in the New York metropolitan area were represented for purposes of the Railway Labor Act by Locals 808 and 459 of the International Brotherhood of Teamsters ("IBT" herein), and these locals had separate collective bargaining agreements with REA. Following a representation election in 1965 the BRC was certified on December 10, 1965 by the National Mediation Board as the collective bargaining representative for all of REA's platform and vehicle employees, including those that had been represented by the IBT, and since that date the employees here involved became members of the Lodge. Under the BRC's Constitution members of the Lodge delegated to the BRC the right to negotiate and sign a nation-wide contract with REA which would be binding on members of all lodges, including Lodge 2035.

At the time when the BRC was certified as the bargaining representative of the members of the Lodge there were in existence pending notices for revision of existing agreements between REA and IBT pursuant to § 6 of the Railway Labor Act (45 U.S.C. § 156), served by IBT on August 4 and 5, 1964, and by REA on September 9, 1964, all seeking revision of the IBT agreement. After the BRC was certified, REA entered into negotiations with the BRC with respect to the IBT notices and additional § 6 notices served by the BRC.

On May 11, 1966, following negotiations, REA and the BRC entered into a basic Mediation Agreement, effective until July 1, 1967, which purported to dispose of all pending § 6 notices and to settle all disputes between the parties relating to pay rates, vacations, retirement and certain other terms. It expressly provided that no proposal for changes in pay, hours of service or working conditions could be initiated until June 1, 1967. As a result of further negotiations the parties entered into a nation-wide Rules Agreement on December 16, 1966, governing hours of service and working conditions, effective January 1, 1967 for all of plaintiff's employees represented by the BRC including the defendants and members of the Lodge. The Rules Agreement, like the May 11, 1966 Mediation Agreement, was executed by the national officers of BRC. It, in turn, was supplemented by a local agreement, dated December 27, 1966, applicable to plaintiff's employees in the New York City area who were represented by the BRC, which provided for stabilization of employment in lieu of benefits provided for by Rule 13 of the Rules Agreement. The latter agreement was executed on behalf of BRC by R. J. Devlin, General Chairman of the BRC's New York District Board of Adjustment.

On January 8, 1967, the Lodge held its regular monthly meeting, at which the members were to receive an explanation from Mr. Devlin with respect to the terms of the new Rules Agreement and December 27, 1966 supplement. Various questions were asked of Mr. Devlin by members with respect to (1) provisions of the agreements requiring work at straight time on Sunday and that employees wait two years for a week's vacation, (2) REA's practice of using trailers and allowing non-REA employees to load and unload such trailers, (3) the effect of a new pooling arrangement on employees'

rights to bid on jobs, and (4) the fact that the contracts had been negotiated without having a representative of the Lodge present at the negotiations. Dissatisfaction was expressed by the members, many of whom walked out before the meeting was concluded.

Although no strike vote was taken at the January 8, 1967 meeting, members of the Lodge who were scheduled to appear for the midnight shift at 12:01 A.M. on January 9, 1967, did not report for duty, and on subsequent shifts on the same day all but a handful of the 1,300 odd drivers employed by REA in the New York metropolitan area did not report for work.

The work stoppage, which continued until January 11, 1967, following the Court's issuance of a temporary restraining order, threatened irreparable injury to REA and its customers. REA daily handles approximately 37,700 inbound and outbound shipments in the New York metropolitan area, from which it grosses an average of $325,800 daily, or about 13% of its entire express traffic revenues in the United States. Many of the shipments contain perishables, domestic pets, chickens, medical and hospital supplies that are essential to the health, and materials and equipment that are important to the national defense of the United States. Among the items frequently shipped are such emergency supplies as blood plasma, vaccines for smallpox, measles and the like, corneal transplants, radio isotopes, and various serums. Other shipments include perishable foodstuffs, corpses, and explosives. The wide variety of the shipments and the fact that they include many perishable and emergency items, makes it impossible to measure accurately the present and future loss of business and of good will that would result from a strike or work stoppage.

On January 9, 1967, REA instituted this action seeking injunctive relief and damages. On January 10, 1967, pursuant to REA's application, the Court issued a temporary restraining order prohibiting the defendants and members of the Lodge having knowledge of the order from continuing the strike or work stoppage pending a hearing on REA's application for preliminary injunctive relief. On January 20, 1967, in an effort to determine the actual cause of the work stoppage and to induce the parties to make every effort to settle the differences causing it, the Court directed the defendants to submit to the BRC and the REA a list of the grievances or demands that led to the strike. Such a list was furnished by the defendants to the BRC on January 20, 1967, and became the subject of conferences between the BRC and REA. A copy, which was furnished to the Court at a hearing on January 24, 1967, revealed a schedule of more than 20 demands or grievances with respect to working conditions under the Rules Agreement of December 16, 1966. Defendants concede that all but two of these demands or grievances related to interpretation and application of the Rules Agreement and constituted "minor disputes" within the meaning of § 3 of the Railway Labor Act (45 U.S.C. § 153, First, (i)), which provides:

"(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

Defendants further concede that with respect to any work stoppage caused by such "minor disputes", plaintiff would be entitled to injunctive relief requiring that the processes of the Railway Labor Act, rather than self-help, first be used. Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.,

363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Elgin Joliet & Eastern Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); Long Island R.R. v. Systems Federation No. 156, 368 F.2d 50 (2 Cir., 1966). Defendants further agree that under the terms of the BRC Constitution, by which they are bound, they have delegatd to BRC the authority to initiate any changes in, or additions to, the foregoing agreements relating to hours of service or working conditions, and that as long as the BRC continues as their representative, none of the defendants, including the Lodge, has the right to initiate or conduct such negotiations.

The principal question presented, therefore, is whether plaintiff is entitled to any relief against a strike or work stoppage attributed by the defendants in part to the two remaining issues: (1) whether the REA may use tractor-trailers for pick-up and delivery in the New York City area; and (2) whether non-employees (i. e., persons not employed by plaintiff) may load and unload such tractor-trailers. In order to resolve the issues as promptly as possible the case was heard by the Court on January 31, 1967, at which hearing proof was offered by both sides, upon a stipulation pursuant to Rule 65(a) (2), F.R.Civ.P. that plaintiff's application for preliminary injunctive relief was to be consolidated with the trial on the merits of plaintiff's suit for permanent relief. The following additional facts were adduced:

Rule 3 of REA's Local Agreement with the IBT, effective January 1, 1963, relating to the New York Metropolitan District, expressly prohibited REA from permitting anyone other than REA employees to load and unload so-called "tractor-trailers" or "trailers" used by the REA in pick-up and delivery service as follows:

"All work of Vehicle Division shall be performed by employes coming within the jurisdiction of that Division. Only employes of the Vehicle Division shall be used to load or unload vehicles with the exception of trailers in transfer service and loading and unloading of straight vehicles while feeding. However, present practices will be continued. * * * All work at express facilities of loading or unloading trailers used in pickup or delivery service shall be done either by the Driver assigned to the tractor or by a Driver whose position has been established at the facility by bulletin, for that purpose, as per Rule 6."

Until January, 1967, the only trailers handled by REA in the New York City area were on "transfer service", i. e., in connection with transfer of shipments from one terminal to another. In recent years, however, the practice of "containerization" has been developed by shippers in various parts of the country, whereby they use their own employees to pack large containers in trailers at the shipping point and ship the pre-packed or loaded trailers by common carrier (such as REA) to a consignee where they are unloaded by employees of the shipper or consignee.

On September 9, 1964 REA served a notice on IBT under § 6 of the Railway Labor Act seeking to change the January 1, 1963 agreement to provide that REA vehicle employees would load and unload trucks or tractor-trailers "except where applicable tariffs provided that customers may load or unload". According to REA and BRC officials the purpose of this notice, which, REA says, was later explained in negotiations with the BRC, was to repeal or modify Rule 3's restrictions on loading and unloading of tractor-trailers in order to permit handling by REA employees of pre-packed, pre-loaded shipments of the container-type that are loaded and unloaded by others. There followed the December 10, 1965 certification of the BRC as defendant's bargaining representative in lieu of IBT and the BRC-REA negotiation of the various Section 6 notices (including REA's notice of September 9, 1964 regarding loading and unloading of trailers by non-REA employees) that resulted in

the May 11, 1966, December 16, 1966, and December 27, 1966 agreements. REA says that in these negotiations the parties orally agreed to eliminate the requirement of Rule 3 of the January 1, 1963 agreement with the IBT (which had continued in effect after BRC was certified) that REA employees load and unload all trailers. However, none of the REA-BRC agreements executed in 1966 as a result of these negotiations contain any provisions expressly cancelling the January 1, 1963 agreement or Rule 3 thereof, or any provisions purporting to define what work shall be done by REA employees and others.

Plaintiff interprets the 1966 REA-BRC agreements as requiring defendants and REA employees to handle trailers loaded by employees of a shipper where a tariff for container shipments has been filed. In support of this interpretation REA points to testimony as to the REA-BRC negotiations, which was corroborated by unsworn statements of BRC representatives to the Court. It further contends that whatever is not expressly prohibited by the 1966 agreements is permitted.

REA's interpretation might be convincing and conclusive if it were not for the fact that the earlier agreement with the IBT had contained express prohibitions on the subject, whereas the 1966 agreements neither expressly repeal or nullify these prohibitions, nor do they expressly authorize the practice now claimed by REA to be permitted. Furthermore, no explanation has been offered by REA or BRC as to why, if it was the intention of the parties to change such an apparently important provision of the old agreement, they did not reduce this portion of their agreement to writing. For these reasons the defendants contend that the 1966 agreements do not permit loading and unloading of trailers by non-REA personnel and that since REA has violated the terms of the agreements, it may not have relief from the Court against the threatened work stoppage.

The difficulty with defendant's position is that it ignores the fact that the controversy, insofar as it relates to use and loading of trailers, stems from conflicting interpretations of the 1966 REA-BRC agreements, and thus requires defendants to resort to Railway Labor Act procedures rather than to self-help, at least at this stage. If the new agreements were intended to repeal Rule 3 of the IBT agreement and, by failure to mention loading of trailers at all, to permit trailer-loading by non-REA personnel, defendants would be bound accordingly. If, on the other hand, Rule 3 of the prior agreement with IBT was never repealed, or the new agreements were not intended to permit use of non-REA personnel, the practice would be subject to further Section 6 negotiation.

■■■ In any event, since the dispute leading to the work stoppage falls directly within the language of § 3 of the Railway Labor Act (45 U.S.C. § 153, First, (i)), being a dispute "growing out of * * * the interpretation or application of agreements concerning rates of pay, rules, or working conditions", it is a dispute within the exclusive jurisdiction of the National Railroad Adjustment Board. With respect to such disputes Congress has expressly declared that the carrier and employees must "exert every reasonable effort to make and maintain agreements" 45 U.S.C. § 152, First. The employees may not strike on account of such a dispute, and a strike caused by it must be enjoined. Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., supra. Under the Railway Labor Act only the Board may interpret the agreement for the purpose of resolving the dispute, Slocum v. Delaware, L. & W. R.R., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950), and any employee or group of employees, including the defendants, has the right under the Act to petition the Board under 45 U.S.C. § 153.

Even if the dispute arose not from interpretation of the existing 1966 agreements but from efforts by members of the Lodge to seek new rules with respect

to trailer-loading that were not provided for by those agreements, a serious question exists as to whether the members of the Lodge would have the right to strike before making every effort to induce the BRC, as their representative, to resort to the machinery that has been established by the Railway Labor Act for handling of such major disputes in order "to avoid any interruption to commerce or to the operation of any carrier engaged therein" 45 U.S.C. § 151(a) (1); Elgin J. & E. Ry. v. Burley, supra. Faced with a remarkably similar set of circumstances the Court of Appeals for this Circuit recently upheld a preliminary injunction restraining a strike by a dissident unit of the bargaining representative, which sought separate contract rights from the employer. Long Island R.R. v. System Federation No. 156, supra.

The Court cannot avoid noting that while the issue of trailer-loading may have been one cause of the work stoppage, an equally important if not greater factor was the BRC's apparent unwillingness to have a representative of the Lodge at the bargaining table when the December 27, 1966 agreement with respect to the New York City area was negotiated and signed. Since the BRC represents more than 200 lodges throughout the country, it would be impractical to have a representative of every lodge present at negotiation of overall or national agreements with the REA. On the other hand, the New York City agreement, in which the Lodge here has a vital interest, is a different matter. But it is equally apparent that the conduct of the members of the Lodge at the January 8th meeting was impetuous, since the issues clearly required resort to the procedures of the Railway Labor Act rather than to self-help.

Accordingly, for the reasons indicated, the Court concludes that plaintiff's prayer for injunctive relief must be granted, and the foregoing opinion shall constitute the Court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P. Injunctive relief is granted as to the defendants for the reason that were it not for their activities on the evening of January 8, 1967, it seems unlikely that the January 9, 1967 work stoppage would have occurred, and relief against the defendants, while not a guarantee against a recurrence, should go far toward preventing it. However, the Court does not find the proof sufficient to warrant entry of any money judgment against the defendants personally. Cf. Winston Research Corp. v. Minnesota Mining & Mfg. Co., 350 F.2d 134, 144 (9th Cir. 1965).

Settle order.