AMSTAR CORPORATION, Plaintiff,

v.

AMALGAMATED MEAT CUTTERS & BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO et al., Defendants.

Civ. A. No. 72–84.

United States District Court, E. D. Louisiana, New Orleans Division.

Jan. 26, 1972.

---

David L. McComb, Chaffe, · McCall, Phillips, Toler & Sarpy, New Orleans, La., Andrew M. Kramer, Anthony J. Crement, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for plaintiff.

Hilliard Fazande, II, Ernest L. Jones, Cotton, Jones & Fazande, New Orleans, La., for defendants.

## OPINION

R. BLAKE WEST, District Judge.

In this matter, plaintiff, Amstar Corporation (Company), seeks to enjoin defendants, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO (Union), Local No. P–1101 (Local) various representatives of Union and Local, and the members thereof, from conducting an alleged work stoppage at Company's Chalmette, Louisiana, sugar refinery, in violation of a collective bargaining Agreement[1] between Company and defendants, Union and Local, and to require that Union and Local submit the points allegedly at issue between the parties to arbitration in accordance with the terms of the Agreement.[2] On January 11, 1972 the Court issued a Temporary Restraining Order, and, after conducting an evidentiary hearing on January 14, 1972, ordered that an injunction issue as prayed by Company.

Central to the issues in this case is the construction to be given to the terms and conditions of the Agreement in the light of the controlling legal authorities. Included in the Agreement is a "no strike" provision, Article XIX, which provides:

"ARTICLE XIX—STRIKES, STOPPAGES AND LOCKOUTS

(1) It is intended that the procedures herein shall serve as a means for peaceful settlement of all disputes that may arise between the Company, its employees and/or the Union.

(2) Management shall not lock out any employees, and neither the International nor the Local shall authorize or encourage any strike, stoppage, slowdown or picketing.

(3) No strike, stoppage, slow-down or picketing shall be considered a breach by the International or the Local of this Agreement if it occurs without authorization or encouragement by the International or the Local and if they both promptly use all reasonable efforts to avoid and end such strike,

1. "Agreement between American Sugar Company Chalmette Refinery and Amalgamated Meat Cutters and Butcher Workmen of North America and its Local Union No. P–1101, Sugar and Allied Products Division, American Federation of Labor-Congress of Industrial Organizations, February 1, 1970–February 1, 1973."

2. The Court's jurisdiction is invoked under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1964) which provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

stoppage, slow-down or picketing including the following procedure:

> The International and the Local, through their respective officials, in writing as well as orally, shall notify the persons involved that the strike, stoppage, slow-down or picketing is a violation of this Agreement and is not authorized by the Local or the International and that the employees involved should return promptly to their respective jobs and cease any action which may adversely affect production.

> (4) Any employee who encourages or participates in a strike, stoppage, slow-down or picketing shall be subject to discharge or other disciplinary action by Management. If requested by the Local, such disciplinary action shall be reviewed under the grievance procedure set forth in Article III hereof."

An alleged dispute between Company on the one hand and Union and Local on the other arose on January 10, 1972 when employees at Company's refinery declined to report for work by honoring a picket line established by representatives of the International Longshoremen Association (ILA) at the entrance to Company's refinery.[3] The ILA pickets represented legitimately striking Amstar employees from refineries located in Philadelphia, Pennsylvania, Brooklyn, New York, and Boston, Massachusetts. Company and Union and Local differ as to whether there was a suspension of work caused by the honoring of the ILA picket line in violation of the Agreement, and as to whether there is an issue subject to arbitration.

The decision of the United States Supreme Court in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) furnishes the principles which guided this Court in granting injunctive relief:

> "A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity— whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." (Emphasis in original). 398 U.S. at 254, 90 S.Ct. at 1594, 26 L.Ed.2d at 212.

### Mandatory Arbitration

Pursuant to the holding in *Boys Markets* the Court first inquired whether Company, Union, and Local were bound by the Agreement to arbitrate the alleged dispute which is the subject of the work stoppage. The issue is crucial because a requirement of mandatory arbitration is essential to the granting of injunctive relief.

Article III, § (1) of the Agreement provides a system for mandatory adjustment of grievances:

> "When differences or complaints arise between Management and the Local, or any employee or employees, *there shall be no suspension of work on account of such disputes.* Grievances must be filed within a period of thirty (30) days following the occurrence of the grievance, except where by mutual

3. On January 10, 1972 only 21 of approximately 600 Union members reported for work. On the four following days there was only a slight increase in the number of Union members who reported for work.

agreement, due to the importance of the grievance, the time limit is extended." (Emphasis added).

The quoted provision not only makes grievance adjustment mandatory, but specifically rejects work suspension as a device to procure settlement of disputes.

Upon a failure of grievance adjustment, Article III, § 2(d) of the Agreement sets forth the procedure by which grievances are to be submitted for arbitration:

"If the grievance is not so settled, the Union may demand arbitration by notifying the Company in writing. Such demand must take place within two (2) weeks after the conclusion of the conference referred to in (c) above. The parties have, upon execution of this agreement, agreed upon a panel of four arbitrators who shall have referred to them grievances arising under this Agreement. The parties shall jointly notify the arbitrator, who shall be rotated from the panel in alphabetical order, within three days after the Company has been advised of the Union's intent to arbitrate the matter. The parties will review the panel once each year."

It might be argued that under this provision arbitration is not mandatory because Union has an option to demand or not to demand arbitration. However, such argument is untenable when tested against the overall meaning of the Agreement. Article XIX, for example, provides that ". . . neither the International nor the Local shall authorize

or encourage any strike, stoppage, slowdown or picketing." Certainly then, an option which is *not* available to Union or Local is the utilization of work suspension as a means of expressing a grievance. It is noted that nowhere in Article III, nor for that matter in any other part of the Agreement, is there any limitation on the Union or its members from raising any "differences or complaints" as a grievance.

Indeed, the rationale underlying the Agreement, as set forth in the introduction, is "to curtail misunderstanding and establish a means whereby any misunderstanding which does arise may be peacefully and satisfactorily disposed of by sincere and patient effort in the manner herein provided." The *only* method provided in the Agreement to so dispose of misunderstandings is the system of grievance adjustment and arbitration; there is no optional device for the settlement of disputes. It is abundantly clear that the intent of the parties was to employ arbitration as "a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures".[4] Consistent with the intent of the parties to the Agreement, the Court holds that the arbitration procedures established therein are mandatory within the meaning of *Boys Markets*.[5]

### Dispute Subject to the Agreement

Having determined that arbitration is mandatory, the next question considered by the Court was whether the grievance,

---

4. *Boys Markets*, 398 U.S., at 249, 90 S.Ct., at 1591, 26 L.Ed.2d, at 209.

5. Furthermore, the Court has noted Justice Brennan's characterization of those circumstances under which the *Boys Markets* principles are controlling:
"We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." 398 U.S., at 253, 90 S.Ct., at 1594, 26 L. Ed.2d, at 212.
The use of the conjunctive "or" clearly indicates that a mandatory grievance adjustment provision *alone* is sufficient to enable issuance of injunctive relief. (Pro-

vided, of course, that the subject matter of the dispute is governed by the terms and conditions of the collective bargaining agreement. This issue is addressed later in the body of the opinion). It cannot be seriously disputed that the Agreement in the instant case provides for mandatory grievance adjustment, and, in consideration of the passage quoted above, that fact by itself satisfies the *Boys Markets* criterion. This approach, however, is in the nature of a digression, because the Court is firmly of the opinion that both the grievance adjustment and arbitration provisions are mandatory under the terms of the Agreement in this case.

the alleged matter in dispute between the parties, is treated by the terms and conditions of the Agreement, and is therefore arbitrable. The alleged dispute in the present case concerned the honoring of another union's picket line. Union and Local contended that their members, acting independently of Union interference, and as a matter of personal conscience, were entitled to honor the ILA picket line, and Company contended that Union and Local, by observing the picket line, were in violation of the no strike clause in the agreement.

The issue for this Court to determine was Company's claim that it and Union and Local agreed to submit to mandatory arbitration (1) factual determinations as to whether the Union was encouraging a strike, stoppage or slow-down, and (2) legal determinations as to whether honoring the picket line constituted a stoppage in violation of Article XIX.

In deciding whether or not the parties bound themselves to arbitrate the work stoppage question, the Court's examination was "confined to ascertaining whether the party seeking arbitration is making a claim which *on its face* is governed by the contract." (Emphasis supplied.) Southwestern Bell Telephone Co. v. Communication Workers of America, Local 6222, 454 F.2d 1333, 1336 (5th Cir., 1971). Applying the *Southwestern Bell* test to the case at bar, this Court holds that Company made a claim which on its face is governed by Article XIX of the Agreement. Article XIX, § (2) specifically required that the Union shall not ". . . encourage any strike, stoppage, slow-down or picketing." This language of the Article precisely encompassed the very heart of the dispute between the parties.[6]

Mr. Leo Scott, an official of Local P–1101, testified that he neither instructed the Union membership to cross or not to cross the ILA picket line, but, as a matter of fact, only 3.5% (approximately) of the workers crossed the line on January 10, 1972. Furthermore, it was uncontroverted that no Union or Local official or representative reported to work during the week of January 10. Company argued that such conduct by Union and Local officials and representatives encouraged stoppages and picketing in violation of Article XIX.[7] Union and Local contended that, as a matter of conscience and union principles, their members had the right to honor the picket line. This is the heart of the dispute. It is the opinion of the Court that the terms of Article XIX more than sufficiently treat the subject matter of this dispute so as to require arbitration.[8]

---

6. In Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed. 2d 474 (1960), the Supreme Court expressly held that a claim by an employer that the union was violating a no strike clause was arbitrable.

7. See United States v. International Union, United Mine Workers of America, 77 F. Supp. 563 (D., D.C.1949) aff'd, 85 U.S. App.D.C. 149, 177 F.2d 29 (1949), cert. den., 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1941); Roadway Express, Inc. v. Highway Truck Drivers and Helpers, 299 F.Supp. 1058 (E.D.Pa., 1969); United Textile Workers of America v. Newberry Mills, Inc., 238 F.Supp. 366 (W.D.S.C., 1965).

8. Illustrative of the issue is the decision of Simplex Wire and Cable Co. v. Local 2208 of the International Brotherhood of Electrical Workers, AFL–CIO, 314 F. Supp. 885 (D.N.H., 1970). In that case members of the defendant union, Local 2208, refused to cross the picket line of another union, which refusal resulted "in a virtual standstill of the Company's production". 314 F.Supp., at 885. The Company sought an injunction against the Local, but such relief was denied because the subject of the dispute, i. e., the honoring of picket lines, was not governed by the collective bargaining agreement between those parties:

"In the instant case, there is no grievance within the terms of the contract between Local 2208 and the Company.

Even if the Court entertained doubts as to whether the matter in dispute should be arbitrated, it is well established as a matter of law that, where there is a doubt as to whether a matter in dispute may or may not be treated by the terms of a collective bargaining agreement, such doubt should be resolved in favor of coverage. In Communications Workers of America v. Southwestern Bell Telephone Co., 415 F. 2d 35, 39 (5th Cir., 1969), the Fifth Circuit held that:

"Interpretation of contract language restricting the scope of arbitration is governed by the rigid standards established in the *Steelworkers'* cases. These require that 'only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . .', United Steelworkers of America v. Warrior and Gulf Navigation Company, *supra*, 363 U.S. 574, at 585, 80 S.Ct. 1347, at 1354, 4 L.Ed.2d 1409, and that an order prohibiting arbitration cannot be issued 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' United Steelworkers of America v. Warrior and Gulf Navigation Company, *supra,* 363 U.S. at 582–583, 80 S.Ct., at 1353. As summarized by the Second Circuit Court of Appeals in Proctor [Procter] & Gamble Independent Union of Port Ivory, N. Y. v. Proctor [Procter] & Gamble Manufacturing Company, 298 F.2d 644, at 645–646 (1962):

'The nub of the matter is that under the broad and comprehensive standard labor arbitration clause every grievance is arbitrable, unless the provisions of the collective bargaining agreement concerning grievances and arbitration contain some clear and unambiguous clause of exclusion, or there is some other term of the agreement that indicates beyond peradventure of doubt that a grievance concerning a particular matter is not intended to be covered by the grievance and arbitration procedure set forth in the agreement . . .' "

The principle was concisely summarized in Howard Electric Co. v. International Brotherhood of Electrical Workers Local Union No. 570, 423 F.2d 164 (9th Cir., 1970). It was held therein that:

"Where doubt exists as to the scope of the particular provision, a broad construction is favored to carry out the parties' presumed intent and the national labor policy favoring the settlement of labor disputes by arbitration." [9]

That Court went on to hold that a dispute concerning violation of no strike provisions in a collective bargaining agreement was a proper subject for arbitration, especially since "there is nothing in the contract specifically excluding an alleged breach of a no-strike provision".[10] In the instant case, Article XIX of the Agreement particularly treats the matter in dispute and, consistent with the intent of the parties and with national labor policy, the Court has ordered that the matter in dispute herein be submitted to arbitration in accordance with Article III, § (2) (d) of the Agreement.

There is nothing in the collective bargaining agreement even remotely suggesting that Local 2208 has any obligations relative to the picket lines of other bargaining units. Thus, there is no dispute subject to arbitration under the *collective bargaining agreement*, and no injunctive order may be issued." 314 F.Supp., at 886.

The rationale of *Simplex Wire*, as applied to the collective bargaining agreement herein, produces the opposite result.

9. 423 F.2d at 166.

10. 423 F.2d, at 167.

This Court, of course, makes no determination as to the merits of the dispute between the parties. That is a matter for the arbitrator to decide. Oil, Chemical and Atomic Workers International Union v. Southern Union Gas Company, 379 F.2d 774 (5th Cir., 1967).

### Equity

The final consideration compelled by *Boys Markets* involves principles of equity. Will the employer suffer irreparable injury by continuance of the work stoppage? Will the employer suffer more from denial of an injunction than will the union from its issuance?

The evidence at the hearing in this matter was uncontroverted that the productivity of Company was drastically hampered during the alleged work stoppage at a time at which the Company was confronted with pressing deadlines to meet orders crucial to the Company's survival.[11] That Company would suffer irreparable injury from a continuance of the alleged work stoppage is irrefutable. It is further clear that Company would suffer considerably more from a denial of injunction than would Union from its issuance. Union may still press any grievance in the manner anticipated by the parties—by arbitration. The equities of this case lie heavily in favor of arbitration because it is the Court's opinion that industrial disputes are better resolved by diligent and meaningful negotiation rather than by resort to self-help measures such as Company lockouts or Union walkouts.

For the foregoing reasons, the injunction was issued and the parties were ordered to participate in arbitration of any dispute between them in accordance with the Agreement.

11. The District Controller of the Refinery testified at the hearing that (1) Company was delinquent on a January 10, 1972

shipping date; and (2) that Company immediately must fill government priority orders for 28 million pounds of sugar.