**AMSTAR CORPORATION, Plaintiff,**

v.

**UNITED SUGAR WORKERS LOCAL 9 et al., Defendants.**

Civ. A. No. 72 C 205.

United States District Court,
E. D. New York.

June 30, 1972.

Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., and Sullivan & Cromwell, New York City, for plaintiff.

Theodore A. Nasdahl and Lester Lichter, New York City, for defendants.

NEAHER, District Judge.

In this action brought under Section 301 of the Labor Management Relations

Act of 1947, as amended, 29 U.S.C. § 185 et seq., plaintiff moved for a preliminary injunction pursuant to Rule 65, F.R.Civ. P., restraining the defendant union from engaging in a strike and other threatened violations of a collective bargaining agreement between the parties. While the strike was in progress a five-day temporary restraining order was issued pursuant to Section 7 of the Norris-La-Guardia Act, 29 U.S.C. § 107. The striking employees returned to work shortly thereafter but on defendants' consent the temporary restraint has remained in effect pending the court's determination after a full testimonial hearing on the application for a preliminary injunction.

Plaintiff, a Delaware corporation, is engaged in the production of refined cane sugar at its refinery in Brooklyn, New York. It also operates sugar refineries located at Philadelphia, Pennsylvania, Boston, Massachusetts, Baltimore, Maryland, and Chalmette, Louisiana. Defendants are the officers, executive board members and individual employee members of United Sugar Workers Local 9, an affiliate of Sugar Workers Council of North America, ILA, AFL–CIO (hereinafter collectively referred to as the "union"). The union is the collective bargaining representative of approximately 500 production and maintenance employees at plaintiff's Brooklyn refinery.

The current collective bargaining agreement between the parties was negotiated during a strike in January 1972 and went into effect after ratification by the union's membership on January 24. The striking employees returned to work immediately thereafter.

The agreement expressly provides that

"When differences or complaints arise between Management and the Union, or any employee or employees, there shall be no suspension of work on account of such disputes." Article III (3.01).

If a dispute is not settled by means of the detailed grievance procedure prescribed in the agreement, either party may demand arbitration and, after compliance with specified notice provisions, "the grievance *shall* be referred for decision to the Arbitrator". Article III (3.03), emphasis supplied. The agreement authorizes the arbitrator "to make decisions in cases of alleged violation and/or differences as to the interpretation of the terms of this Agreement . . as the facts and circumstances may warrant, subject to the limitations of this Agreement." His decision and award "shall be final and binding . . . and the parties agree to abide by such decision." Article III (3.03). Express provision is also made that "[t]his Agreement and *all* other prior Agreements, whether written or *oral*, which are established to the satisfaction of an arbitrator shall be binding upon the parties hereto." Article XXVI (26.01), emphasis supplied. The agreement also contains a "no-strike" clause. Article XIX (19.01).

The evidence at the hearing abundantly established that the two-day walkout at plaintiff's Brooklyn refinery on February 14 and 15 was union sanctioned and involved a dispute between the union and management which the parties were contractually bound to arbitrate under the terms of their agreement. The dispute clearly concerned the scope and alleged violation of a "no reprisal" commitment given by plaintiff to the union during the course of the bargaining negotiations which led to the final formulation and ratification of the current agreement and the union's related breach of the "no-strike" clause. Although the "no reprisal" commitment was entirely oral, there is no question that it was made; indeed both parties assert its binding effect as a part of their agreement. The arbitrable character of their difference over its interpretation plainly appears from the circumstances which gave rise to the commitment. In delineating that background below, the court does not intend to limit in any way the function of an arbitrator in resolving the dispute.

Prior to ratification of the current labor agreement, not only plaintiff's

Brooklyn refinery but also its Philadelphia and Boston refineries were on strike, since all were represented by locals of the United Sugar Workers Council. The strike was subsequently extended to plaintiff's Baltimore and Chalmette refineries when Sugar Workers pickets appeared at those locations. Those refineries, however, are represented by a different union, the Amalgamated Meat Cutters and Butcher Workmen of North America ("Meat Cutters"), which had collective bargaining agreements with plaintiff containing no-strike clauses. When employees at Baltimore and Chalmette refused to cross the Sugar Workers' picket line, with a resulting shutdown of those refineries, plaintiff obtained a temporary restraining order and thereafter a preliminary injunction against the Meat Cutters from the United States District Court in New Orleans.[1] That court, as required by law, imposed upon plaintiff as a condition that it arbitrate its dispute with the Meat Cutters. The Meat Cutters members in Chalmette disobeyed the court's orders and in Baltimore an employee was charged criminally for carrying a loaded firearm on plaintiff's premises during the walkout.

While negotiations for the current agreement were going on the union's

president, Randazzo, became concerned that the Baltimore-Chalmette picketing activities might result in contempt proceedings or other punitive measures against union members. He therefore insisted on the "no reprisal" commitment which was given by plaintiff together with explicit assurances that plaintiff contemplated no contempt proceedings or disciplinary action against employees with the single exception of the Baltimore employee arrested on the firearms charge. The current labor agreement was concluded and ratified on that understanding.[2]

On February 14—three weeks after ratification and return of the union members to work—Randazzo ordered not only the Brooklyn refinery but also those in Boston and Philadelphia shut down.[3] The sole basis for this strike action was his contention that plaintiff had breached the "no reprisal" commitment by proceeding to arbitration of its grievance against the Meat Cutters in compliance with the order of the District Court in New Orleans.[4] The union made no attempt to invoke the grievance and arbitration procedure provided in the newly ratified agreement. Nor did it satisfactorily respond to plaintiff's requests and formal demand that the differences between the parties be referred to arbitration.[5]

1. See Amstar Corp. v. Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO, 337 F.Supp. 810 (E.D.La.1972).

2. Holloway, plaintiff's negotiator, explained his understanding of the "no reprisal" commitment as follows (Tr. 25):
   "Basically that we would not take disciplinary action against the employees except for this one case in Baltimore which I had taken exception to. We would certainly not go in for the contempt because I knew we were not going in for contempt in New Orleans."
   Randazzo understood it in essentially the same terms (Tr. 121):
   " . . . [W]e weren't going to have any reprisals as such, since I was already aware of all the problems that occurred between New Orleans and Baltimore of various instances that occurred between the Company officials

and the union officials and the rank and file, and I was already aware, which is the normal and typical thing that usually a company tries to get back at employees. . . . And I was protecting myself in these particular areas, that people shouldn't be penalized because they support our picket line."

3. Randazzo is not only president of Local 9 but also president of the Sugar Workers Council of North America and therefore in a position to direct actions of the Philadelphia and Boston locals.

4. Randazzo had earlier been assured by plaintiff that in no event was it seeking damages on account of the Chalmette incident.

5. On February 14, after the walkout began, plaintiff sent a telegram to Randazzo and all the union's board members calling attention to the no-strike provisions of

■ In opposing this application the union argues that plaintiff has wholly failed to meet the requirements for injunctive relief established by the Supreme Court in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). First, it says, there are grave questions as to the existence of a contract between the parties. That suggestion is disingenuous. In evidence, without objection by the union, are authentic copies of three documents which comprise the current agreement as ratified by the union's membership on January 24. One is the comprehensive printed agreement between the parties in force for the three-year period ending September 30, 1971 (Pl.Exh. 1); the second is a memorandum of agreement executed January 16 at the conclusion of the collective bargaining, which incorporates "all" provisions of the expired agreement "except as deleted or modified hereinafter" (Pl. Exh. 2); and the third is a mutually executed written amendment to the foregoing memorandum dated January 22, 1972, containing early retirement stipulations requested by the union membership as a condition of ratification (Pl. Exh. 3). Thus there is no question, and the court so finds, that on February 14 and 15, when the union engaged in a walkout, there was a binding agreement in effect between the parties which provided without exception for arbitration of "differences or complaints . . . between Management and the Union" without "suspension of work on account of such disputes." Pl.Exh. 1, Article III (3.01).

■ The foregoing finding is in no way affected by the union's further suggestion that the "no reprisals" commitment does not appear to be encompassed within the terms of the parties' agreement, especially since the dispute about it relates to employees of plaintiff whose union, i. e., the Meat Cutters, is not a party to the agreement. The short answer to that contention is that both parties concede the "no reprisals" commitment was made a condition—albeit unwritten—of their present agreement. The sole dispute is their difference over its interpretation and whether it was violated by plaintiff as the union claims.

Such a dispute must be resolved by arbitration under the broad terms of the parties' agreement, which spells out "the only function of the Arbitrator [is] to make decisions in cases of alleged violation and/or differences as to the interpretation of the terms of this Agreement" (Pl.Exh. 1, Article III (3.03)); which expressly covers "oral" as well as written agreements established "to the satisfaction of an arbitrator"; and which permits him to consider past practices of the parties "for evidentiary purposes where appropriate." Pl.Exh. 1, Article XXVI (26.01). "There is nothing to limit the sweep of this language or to except any dispute or class of disputes from arbitration," International Union of Operating Engineers, Local 150, AFL–CIO v. Flair Buildings, Inc., 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (Decided May 30, 1972), particularly where, as here, the dispute so clearly relates to "alleged violation and/or differences as to the interpretation of the terms" of the parties' acknowledged agreement.

the contract and requesting that grievance and arbitration procedure be used to resolve any differences including the question of alleged violation of the no reprisals commitment by plaintiff. Pl.Exh. 4. The only communication from the union was a telegram dated February 15 in which Randazzo advised "that in the interest of resolving differences between the union and the company in an amicable fashion", he was ordering all members back to work as soon as possible but did not anticipate

a full work force would be available before the 7 A.M. shift on February 16. Pl.Exh. 7. The telegram was apparently dispatched after the union was informed of plaintiff's intention to file this action. At the hearing, as hereinafter noted, the union adhered to its position that it is not bound to arbitrate its differences with plaintiff because there is no contract or if there was, the union's mistake about the scope of the "no reprisal" commitment entitled the union to rescind it.

■ Easily answered for the same reason is the further suggestion of the union that this dispute is beyond the reach of arbitration because the union's motivation for insisting on the "no reprisals" commitment was its concern that employees at the Baltimore and Chalmette refineries—not those in Brooklyn—might be subject to punitive retaliation because of their picketing activities in support of the Sugar Workers during its strike. The union brought the matter within the terms of *this* agreement not only by concededly exacting the commitment as a condition of *this* agreement but also by its walkout action in contravention of the express terms of *this* agreement on the claim of alleged violation of the commitment. The interpretation of the "no reprisals" commitment and whether or not plaintiff violated it are thus manifestly arbitrable issues and not unfamiliar subjects of labor arbitration.[6] If there could be any doubts about this, the Supreme Court has made it plain that "[a]n order to arbitrate the particular grievance should not be denied unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of America v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

■ Sensing the difficulty of overcoming conclusive evidence that a new labor agreement mandating arbitration had been ratified, the union next asserts it rescinded the contract by its two-day walkout—characterized as a "withdrawal of services"—when it discovered that plaintiff did not construe "no reprisals" so as to include the court-ordered arbitration of the Chalmette refinery labor dispute. In further support of this asserted right of rescission for unilateral mistake, the union contends, "no benefits have been received under the rescinded contract so that plaintiff has not been deprived of any property by way of wages and pension benefits."[7]

The union's rescission claim is obviously an afterthought and utterly unsupported by any credible evidence or persuasive authority. The two New York cases cited by the union,[8] while illustrative of hornbook principles regarding equitable rescission, do not involve labor agreements and have no application to the facts here. Moreover, "[f]ederal law, fashioned 'from the policy of our national labor laws,' controls." John Wiley & Sons v. Livingston, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1963), quoting from Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957).

As already noted, *supra* p. 6, n. 2, union president Randazzo's own testimony makes it clear that his purpose in demanding the "no reprisal" commitment was to protect individual employees of plaintiff who had refused to cross picket lines in Baltimore and Chalmette from threatened loss of their jobs, possible contempt proceedings for disobeying court orders or other disciplinary action. Company actions of that type *might* well be considered by an arbitrator to be retaliatory acts within the meaning of "reprisal."[9] There is no evidence that any broader meaning was intended. But

---

6. See, *e. g.*, National Distillers Products Company, 69–2 ARB Paragraph 8505 (Cantor, 1969) ; Borden Ice Cream Comany, 66–1 ARB Paragraph 8055 (McKelvey, 1965).

7. Defendants' Memorandum of Law at pp. 11–16, 22. This has reference to the provision in the current agreement deferring until Pay Board approval the 10% per annum increase in hourly wage rates and other monetary benefits for em-

ployees obtained by the union over the next three years (Pl.Exh. 2, p. 6).

8. Sheridan Drive-In, Inc. v. State of New York, 16 A.D.2d 400, 228 N.Y.S.2d 576 (4th Dept. 1962) ; Rosenblum v. Manufacturers Trust Co., 270 N.Y. 79, 200 N.E. 587 (1936).

9. Webster's Third New International Dictionary defines "reprisal" as "5: an action of retaliation (as for injury or attack)."

its interpretation is not for this court. While it is difficult to conceive of plaintiff's refusal to abandon court-ordered arbitration of the Chalmette dispute with the Meat Cutters union as a "reprisal", that is a matter for arbitration. Apposite is Mr. Justice Harlan's comment in John Wiley & Sons v. Livingston, supra at 555, 84 S.Ct. at 917:

> Whether or not the Union's demands have merit will be determined by the arbitrator in light of the fully developed facts. It is sufficient for present purposes that the demands are not so plainly unreasonable that the subject matter of the dispute must be regarded as non-arbitrable because it can be seen in advance that no award to the Union could receive judicial sanction. See Warrior & Gulf, *supra* [363 U.S.] at 582–583 [80 S.Ct. 1347].

In no event, however, can plaintiff's position on the interpretation of "reprisal" be deemed such misleading or mistake-inducing action as would vitiate the current agreement and enable this union to escape its clear obligation to arbitrate.

■■ Having found that the current labor agreement does require the parties to arbitrate their dispute, the remaining question is "whether issuance of an injunction would be warranted under ordinary principles of equity". Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970), quoting from Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228, 82 S.Ct. 1328, 8 L.Ed. 2d 440 (1962). The guidelines for such relief adopted by the Court in *Boys Markets* are "whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 398 U.S. at 254, 90 S.Ct. at 1594. The union contends that none of these conditions has been met: the employees promptly

returned to work; no damage is shown to have been done; there is no prospect of irreparable harm to plaintiff; and no showing of greater harm to plaintiff than to the union if an injunction is issued.

Admittedly no strike was in progress at the time of the hearing, plaintiff's employees having returned to work on the morning of February 16th, some 12 hours after the temporary restraining order was issued. The union contends that this moots the matter of injunctive relief. Plaintiff argues that the threat of further injury has not been removed, pointing out that the union ordered its members to return only after plaintiff indicated its intention to sue for injunctive relief. The temporary restraining order was issued at 7:00 p. m. on February 15th, in time for employees to commence work on the midnight shift, but none reported for duty until the first shift on February 16th on orders of union president Randazzo that "everybody would be out for a total of two days, to make a point" (Hearing Tr. 142). Plaintiff contends there is no assurance that the union will comply, if this court were to order arbitration. It points to Randazzo's testimony that although he was fully aware of the temporary restraining order issued in New Orleans and the possibility of contempt for disobeying it, nonetheless "I refused to comply with the Judge's order" (Hearing Tr. 116). And he ordered this walkout at the virtual commencement of a new three-year contract which disavowed such conduct as a means of resolving disputes.

Termination of a strike in violation of a collective labor agreement does not automatically moot an application for injunctive relief. "The test of mootness in a case asking for injunctive relief is whether the injury is continuing or is likely to be repeated." Southwestern Bell Telephone Co. v. Communications Workers of America, AFL–CIO, 454 F.2d 1333, 1334 (5 Cir. 1971), citing Douds v. International Longshoremen's Association, 242 F.2d 808 (2 Cir. 1957). In *Douds* the National Labor Relations

Board ("Board") had sought preliminary injunctive relief pending investigation of an unfair labor practice charge lodged by a third party against the defendant International Longshoremen's Association (ILA). The charge grew out of self-help tactics employed by ILA when the employer, Bush Terminal Company, contracted for certain work by the third party. The Board's application for a preliminary injunction was denied apparently because the district court "thought the dispute too trivial to warrant interference by injunction." 242 F.2d at 811. The third party appealed and while the appeal was pending, a new labor agreement was entered into between ILA and the employer. That agreement, it was urged, settled the dispute and thus rendered the case moot. In rejecting that contention and directing injunctive relief, the Court of Appeals emphasized the importance of such relief "to preserve the integrity of the procedure before the Board" as "the tribunal designated . . . to determine precisely such questions" as were in dispute. 242 F.2d at 811.

In *Douds*, it is true, injunctive relief was granted in aid of the Board's statutory responsibility to determine a dispute involved in an unfair labor practice complaint. True also, the complainant was the third party, not the employer.[10] But the underlying principles of the statutory tribunal apply with equal cogency to the analogous situation found here. *Boys Markets, supra,* at 252, 90 S.Ct. 1583, 26 L.Ed.2d 199. The parties, acting as their own legislature, have established a tribunal, the arbitrator, to determine their respective differences and disputes over the interpretation of their agreement without cessation of work while the decisional process is going on.

The dispute between the parties is still unresolved and rights under the agreement remain to be vindicated. The dispute should have been referred to an arbitrator under the procedure they themselves set up for its determination. The union, bypassing that procedure, resorted to self-help with considerable damage to plaintiff.[11]

Plaintiff, in effect, seeks specific performance of the agreement to arbitrate. The union's behavior justifies plaintiff's doubts that such an arbitration can be had without legal compulsion. In order to avail itself of that compulsion, plaintiff must submit to the court's direction that it proceed to arbitration. See Amstar Corporation v. Amalgamated Meat Cutters, Etc., *supra* n. 1, 337 F.Supp. at 817. Equity demands that the union's co-equal obligation to arbitrate be similarly enforced and that the status quo be preserved until the arbitrator has heard and determined the matter.

The union members' return to work does not obviate that need. In Railway Express Agency, Inc. v. Empire City Lodge 2035, 264 F.Supp. 241 (S.D.N.Y. 1967), the defendant union ended a two-day walkout *in violation of an agreement* between the parties after the court had issued a temporary restraining order. Describing the union's conduct as "impetuous, since the issues clearly required resort to the procedures of the Railway Labor Act rather than to self-help", Judge (now Circuit Judge) Mansfield granted the plaintiff employer's prayer for injunctive relief. His further comment that "relief against the defendants, while not a guarantee against a recurrence, should go far toward preventing it," 264 F.Supp. at 246, is most apposite here.

---

10. But as the Court noted, "the ILA is a powerful union and the threat of a strike was no idle gesture." 242 F.2d at 811. Indeed, said the Court, "it is far from clear that similar considerations [*i. e.*, threat of a strike] might not have had something to do with the concession made by Bush Terminal" which, it was urged, made the case moot. *Id.* at 812.

11. During the two-day walkout plaintiff lost approximately eight million pounds of sugar production valued at approximately $1,000,000 in sales with an estimated profit loss of $120,000 (Hearing Tr. 48, 51).

Accordingly, for the reasons indicated, plaintiff's application for a preliminary injunction is granted to the extent of (1) restraining the defendants, pending the final determination of this action, from causing in any manner any strike, stoppage, slowdown or other suspension of work by Sugar Workers Union members at plaintiff's Brooklyn refinery on account of any question, difference, dispute or grievance which has arisen between plaintiff and defendants concerning whether or not plaintiff violated its commitment not to take any reprisals following execution of the current labor agreement, and whether or not the work stoppage at plaintiff's refinery by Sugar Workers Union members was in violation of the parties' agreement, and (2) directing that the parties submit, as soon as practicable, such question, difference, dispute or grievance to arbitration in accordance with the applicable provisions of the agreement. The foregoing decision constitutes the court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Settle order.